Filed 3/6/14  P. v. Prado CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B243204 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA088341) |
| v. | |
| EFRAIN PRADO et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Robert T. Perry, Judge.  Affirmed.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant Efrain Prado.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant Ralph Alfaro.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendants, Ralph Alfaro and Efrain Prado, of first degree murder. (Pen. Code, § 187, subd. (a).)[1] The jury further found true firearm use by a principal and criminal street gang allegations. (§§ 186.22, subd. (b)(1)(C); 12022.53, subds. (d), (e)(1).) Defendants were each sentenced to 50 years to life in state prison. We affirm the judgments.

# II. THE EVIDENCE

## A. The Murder

Marquise LeBlanc attended a party in Pomona on April 17, 2009. Mr. LeBlanc was an 18-year-old African-American man. He was unfamiliar with the Pomona neighborhood in which the party was held. With few exceptions, the other partygoers were young Hispanic men and women. Several of the Latinos in attendance were members or associates of a gang. A certain sect of the gang was known by a Spanish term meaning African-American killers. The party was located in the gang's territory.

During the party, Mr. LeBlanc attempted to dance with girls on the dance floor. He subsequently engaged in a verbal confrontation with gang members or associates. Mr. LeBlanc brandished a gun. The weapon, as it turned out, was nonfunctioning. Mr. LeBlanc waved the gun at those around him. He said, "Who wants to fuck with me now?" Mr. LeBlanc was chased out of the party and subjected to a vicious, brutal beating. The beating was accompanied by gang references and shouts of, "Get that nigger." Deborah Martinez witnessed the initial assault. She described it as "relentless." A swarm of people punched and stomped on the victim. They administered hard blows

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

that Ms. Martinez could hear. Mr. LeBlanc temporarily escaped with Ms. Martinez's help. But he was chased down the street to a place where the attack resumed. Mr. LeBlanc was significantly outnumbered. The estimated number of assailants ranged from 10 to 40. Mr. LeBlanc was beaten unconscious, stabbed and shot. He died of a fatal stab wound to his heart, followed by a gunshot wound to his head.

Eyewitnesses identified defendants as among those who participated in the aggravated assault. An eyewitness identified Mr. Alfaro as attempting to participate in the initial assault on Mr. LeBlanc. Two eyewitnesses saw Mr. Alfaro among 20 male Latinos who then chased Mr. LeBlanc down the street. Mr. LeBlanc was chased toward the spot where he was subsequently beaten, stabbed and shot. Mr. Alfaro caught up to Mr. LeBlanc. Mr. Alfaro hit Mr. LeBlanc. As a result, Mr. LeBlanc fell to the ground. A group of male Latinos continued to kick and stomp Mr. LeBlanc who was trying to protect himself.

When Detective Lange questioned Mr. Alfaro, the following occurred: "[Detective Lange]: . . . [¶] [I]f you were caught up in the mix and you were just being an idiot at that time and you got in that mix with a hit and a kick, we need to know right now. [¶] [Defendant] I just hit and kicked him. . . . [¶] I was the one who chased him on the street. [¶] . . . I was the one who dropped him." Defendant said, "I hit him 'cause when he pulled the [gun] on me so I, that got me mad cause what if he shot me, so that's why I got him. I chased him down the street, he was running, and so I chased him, I hit him, he fell down and that's when I heard everybody -- and that's when I saw everybody come and get him." Defendant admitted kicking Mr. LeBlanc a couple of times. Defendant also said, "With my fist, I hit him a couple more times . . . [¶] . . . on the face . . . ." Defendant said he then returned to the party.

Eyewitnesses also saw Mr. Prado participating in the initial assault. One eyewitness, Ms. Martinez, heard Mr. Prado say, "Get the myate." Another eyewitness saw Mr. Prado stomping Mr. LeBlanc who was on the ground. Mr. Prado was stomping Mr. LeBlanc with force. Mr. Prado admitted to detectives twice kicking Mr. LeBlanc in the legs. Neither Mr. Prado nor Mr. Alfaro personally stabbed or shot Mr. LeBlanc. A

3

fellow gang member or associate, Adam Delgado, was among those seen arguing with Mr. LeBlanc. Mr. Delgado later assaulted Mr. LeBlanc. Mr. Delgado, who was in possession of a pocket knife, was seen making jabbing motions towards Mr. LeBlanc's chest. This occurred as Mr. LeBlanc lay unconscious on the ground.

Martin Haro sent several text messages the day after the party. Mr. Haro indicated he had gone to a party the prior evening and, "Me and the homies nearly killed a nigger." Mr. Haro explained, "We beat his ass . . . because he called a strap out on the homies." In another text message Mr. Haro said, "[W]e stomped the shit out of his face." Following discussion about the fact Mr. LeBlanc had been killed, Mr. Haro said: "Me and [Mr. Alfaro] were the first ones to fuck him up. . . . When he was running down the street we ran behind him, then [Mr. Alfaro] and me started socking him until he fell and then I started kicking his face . . . ."

## B. The Police Interviews

### 1. Mr. Prado

Mr. LeBlanc was murdered on April 17, 2009. Detectives Jennifer Turpin and Michael Lange interviewed Mr. Prado on two separate occasions—April 18 and 21, 2009. Mr. Prado was 20 years old. Mr. Prado went to the party with Mr. Delgado. At first, Mr. Prado admitted only that, "I just barely hit him once," and "I kicked him once." Mr. Prado admitted kicking Mr. LeBlanc once or twice in the legs. Mr. Prado told the detectives, "I wasn't trying like to stomp him out or shit like that." Mr. Prado denied saying anything while kicking Mr. LeBlanc: "There was a lot of people there saying all, 'fuck this nigga.' It wasn't me because I wouldn't say that shit . . . ." Mr. Prado admitted seeing people "stomping" Mr. LeBlanc. Mr. Prado denied seeing anyone with a knife. After Mr. LeBlanc was knocked to the ground, Mr. Prado described to the detectives what happened next, "He was crawling and then I don't know I was just like helping

4

them out and I just gave him like two kicks . . . ." On April 18, at 4 a.m., Mr. Prado left the police station and went to Mr. Delgado's house.

## 2. Mr. Alfaro

Detectives Turpin and Lange interviewed Mr. Alfaro at the police station almost two months after the murder. Mr. Alfaro was 17 years old at the time of the murder and the interview. Mr. Alfaro admitted attending the party. Mr. Alfaro was accompanied by Richard Alfaro[2] and Manuel Armenta. Mr. Armenta is Mr. Alfaro's cousin. Mr. Alfaro witnessed a verbal altercation between Mr. LeBlanc and others. Someone threw a bottle at Mr. LeBlanc. Mr. Alfaro saw Mr. LeBlanc pull out a gun and wave it around. Mr. Alfaro heard, "Get that nigger" and "Fuck that nigger up." Mr. Alfaro saw Mr. Delgado and some "homies" chase Mr. LeBlanc. They chased Mr. LeBlanc toward the front of the house where they attacked him. Mr. Alfaro heard Mr. Delgado say, "Grab his gun." Mr. Alfaro said Mr. LeBlanc temporarily broke free due to Ms. Martinez's intervention. Thereupon, 15 to 20 males, including Mr. Delgado and several gang members, chased Mr. LeBlanc down the street. Mr. Alfaro said Mr. Delgado knocked Mr. LeBlanc to the ground. During the assault, Mr. Alfaro heard Mr. Delgado say, "Get that nigger."

Mr. Alfaro admitted he was a member of the African-American-hating crew associated with the gang. Mr. Alfaro admitted, following the initial assault, chasing Mr. LeBlanc down the street. Mr. Alfaro also admitted punching Mr. LeBlanc and knocking him to the ground. Mr. Alfaro admitted then continuing to punch and kick Mr. LeBlanc. Mr. Alfaro claimed to have left when others arrived and starting beating Mr. LeBlanc. Mr. Alfaro said he acted out of anger. This was because Mr. LeBlanc had

---

[2] Richard Alfaro is Mr. Alfaro's brother. For purposes of clarity we will refer to Richard Alfaro as Richard.

pulled a gun. During the interview, Mr. Alfaro's description of the incident changed at various times.

## C. The Gang Evidence

Detective Greg Freeman testified for the prosecution concerning the gang in this case. Detective Freeman testified as follows. Hispanic gangs are turf oriented. They protect their neighborhoods and their territory. They defend their neighborhoods from rival gangs and from people who disrespect them. Gang members usually commit crimes together because there is strength in numbers. Gang members "put in work" in order to gain respect from their peers. The more work a person puts in, the more respect the individual earns. According to Detective Freeman, the gang itself also gains respect, which equates with power. And, a powerful gang is feared. That fear prevents community members from cooperating with law enforcement and testifying against gang members. And a gang member who snitches is targeted for a severe beating or death.

Gang members in Pomona have access to firearms through burglaries, robberies and on the black market. But it is extremely rare to recover a weapon used in a gang crime because they are disposed of quickly. The present incident involved the largest of several gangs in Pomona. It was a Hispanic turf-based gang that controlled a large area. The gang had over 200 active members and associates. The party Mr. LeBlanc attended was on the border of the gang's territory. "Tagging" or" banging crews" are the "minor leagues" of the gang. They are younger kids who commit lesser crimes. The gang controls and generally recruits from the tagging or banging crews. The gang involved in the present assault and murder had tagging or banging crews including one known by a derogatory Spanish term meaning African-American killers. The gang's "signature crimes" were: vandalism; narcotics sales; carrying concealed weapons; carjacking; car theft; robbery; armed robbery; assault; assault with firearms; attempted murder; murder; and witness intimidation.

According to Detective Freeman, Mr. Alfaro was a member of the tagging crew if not a full member of the gang. On July 9, 2009, Detective Freeman stopped a white Honda Accord. Mr. Alfaro was one of the individuals in the Honda. Mr. Alfaro denied any affiliation with the gang at that time. Mr. Alfaro's cousin, Mr. Armenta, was also in the white Honda. The Armenta family was well-known to be members of the gang.

In response to hypothetical questions tracking the facts of the present case, Detective Freeman testified the murder was committed for the benefit of the gang. Detective Freeman testified: if a gang member attending a party in the gang's territory quarrels with a non-gang member, fellow gang members will protect one another; they will jump the outsider if they perceive that stranger to be disrespecting the gang; it would be disrespectful of the gang for an outsider to dance with neighborhood girls; and, given the gang's profound racism, an African-American who did so would most certainly be noticed. That action by an African-American attending a dance with Latinos and Latinas could very well be considered an act disrespectful of the gang. An African-American male at the party would be given very little leeway and his behavior would be more likely to be perceived as disrespectful than the same conduct by a Latino. Detective Freeman explained: "When an individual disrespects members of a neighborhood, they're going to be dealt with. And this is . . . [the gang] responding and their associates responding that this is what will happen if [you] disrespect us in our neighborhood, this is what we're going to do. It shows all the people in the community and the surrounding gang this is what you're going to end up being if you disrespect us in our neighborhood." Detective Freeman further observed the fact the assault occurred in the presence of a large number of people benefited the gang: "Word gets out on the streets real fast on what happened. And again, through the respect, through the strength, through the intimidation, through the fear, that makes [the gang] that much bigger, stronger of a gang." Detective Freeman described the beating Mr. LeBlanc received as "extreme."

7

## D. The Jury Instructions

The jury was instructed on: aiding and abetting principles; murder; first degree murder; voluntary manslaughter; assault with force likely to produce great bodily injury; and murder or voluntary manslaughter as a natural and probable consequence of aiding and abetting an assault with force likely to produce great bodily injury.

## III. DISCUSSION

### A. Joinder

Defendants each join in the arguments of the other. We accept the joinders only to the extent a co-defendant's argument accrues to the benefit of the other. Where evidentiary insufficiency is asserted and the defendant purporting to join has not articulated how the evidence was insufficient as to him, we reject the purported joinder.

### B. Mr. Alfaro's Confession

As discussed above, Detectives Turbin and Lange interviewed Mr. Alfaro at the police station almost two months after the murder. Mr. Alfaro admitted participating in the attack on Mr. LeBlanc. Mr. Alfaro contends it was reversible error to admit that confession into evidence. He argues the interview with the detectives was custodial, hence he should have been advised of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, 444. At oral argument, Mr. Alfaro's counsel expressly stated defendant was not raising a voluntariness issue.

There is no evidence showing how Mr. Alfaro arrived at the police station. Mr. Alfaro's suppression motion in the trial court related: "[O]n the day of his first interview . . . , defendant was a minor student who was ordered out of his classroom to the principal's office, where he was forced to see Det[ectives] Turpin and Lange. . . .

8

[Mr. Alfaro] was removed from all familiar surroundings, driven to the police station by police in a police car, brought up stairs, and isolated in the same tiny interview room he was later taken on the day of his arrest." However, these unsworn allegations made in a document prepared by defense counsel are not evidence. (*People v. Solomon* (2010) 49 Cal.4th 792, 815, fn. 10; accord *In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 11 [facts asserted by an attorney in letter to the court are not evidence and counsel may not ethically assert matters as facts unless testifying]; *Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 767, fn. 8 ["It goes without saying that statements in a memorandum of points and authorities are not evidence."].) Courts are obligated to disregard such unsworn statements appearing in the parties' papers. (*Smith, Smith & Kring v. Superior Court* (1997) 60 Cal.App.4th 573, 578; *Calcor Space Facility, Inc. v. Superior Court* (1997) 53 Cal.App.4th 216, 224.)

It is undisputed Mr. Alfaro was 17 years old at the time he was interviewed. The interview was video-recorded. We have viewed the video of Mr. Alfaro's interview. He was originally placed in a small interview room with a table and three seats. The room was approximately 5 feet wide and 10 feet in depth and contained 2 doors. One door was next to Mr. Alfaro and it remained closed for the entirety of the interview. A second door could only be seen when it was completely open. During the actual interview, it is clear this second door was partially open because other voices and boisterous laughter could be heard. The voices and laughter emanated from outside the interview room. All of the questioning was polite. As noted and as we shall reiterate, Mr. Alfaro began the interview denying any involvement in the attack on Mr. LeBlanc. After being confronted with the presence of different evidence, Mr. Alfaro would change his story by admitting greater complicity. When Detective Lange raised the other evidence, he did so in a polite and nonconfrontational manner. Although 17 years old, Mr. Alfaro appeared older and acted in a materially more mature fashion.

At the outset of the interview, Detective Turpin said, "We appreciate you coming down here." Detective Lange added: "You understand that you're here freely and voluntarily, right? You understand that?" Mr. Alfaro acknowledged that he did. On the

9

video, it is clear Mr. Alfaro said, Yeah," when asked whether he was present voluntarily and freely. The transcript of the interview states Mr. Alfaro responded to the question of whether he was present voluntarily and freely with the single word, "Huh." The transcript, prepared by the Los Angeles County District Attorney's Office, is in error in that respect; Mr. Alfaro responded, "Yeah." Detective Lange added: "You understand that you're here freely and voluntarily, right? You understand that?" Mr. Alfaro acknowledged that he did.

Detective Lange told defendant the detectives wanted to know what happened at the party. Detective Lange said several names had come up in the investigation, and Mr. Alfaro's was one of them. Detective Lange assured Mr. Alfaro, "[T]hat's not a bad thing, okay?" Initially, the detectives asked general questions about the party. In response, without incriminating himself, defendant described the events leading up to the attack and murder. The detectives sought more detail. They told Mr. Alfaro they believed him and they wanted him to be honest. When Mr. Alfaro later was unable to identify any individuals in the group that chased Mr. LeBlanc, the detectives expressed disbelief. Mr. Alfaro was advised: "There's a thing called accessory after the fact, and that's . . . if you withhold information, and that information benefits somebody else that participated in the crime, you are guilty of it."

Several questions later, Mr. Alfaro stated Mr. Delgado approached Mr. LeBlanc. Subsequently, according to Mr. Alfaro, Mr. Delgado chased Mr. LeBlanc out of the party. Detective Lange reiterated that the two detectives believed Mr. Alfaro. Detective Lange encouraged Mr. Alfaro to identify others saying, "[Y]ou've been doing a real good job . . . ." Defendant then identified "Osir," as having been with Mr. Delgado. As to Mr. Delgado, Mr. Alfaro said, "He was hitting him." As to the young man identified only as "Osir," Mr. Alfaro said, "Hitting [Mr. LeBlanc] and kicking him." And Mr. Alfaro heard Mr. Delgado say, "Get that nigger."

Defendant described Mr. LeBlanc's efforts to flee: "The [B]lack guy ran out [of] the party and he started running towards the street. [] . . . I saw him make a right. [] [O]nce they chased him, I was like 'Forget this, I'm done.'" At that point, the detectives

10

encouraged Mr. Alfaro to admit his participation. Detective Lange advised defendant: "I want you to understand something, there is a lot of people that were in a group that participated and then there was other people that went down just to see what was happening because of curiosity, okay? [¶] Everything . . . you've told us so far is consistent, but we also know, okay, that you went down that way, okay? It's not necessarily a bad thing because everything that you've indicated to me is that you are just watching something go down, okay? I need you to continue to be honest and tell me what else you saw, okay?" When asked how many partygoers were chasing Mr. LeBlanc, Mr. Alfaro said there were 15 to 20. At first, Mr. Alfaro said Mr. Delgado hit Mr. LeBlanc. And then, Mr. Alfaro said Mr. LeBlanc fell to the ground. Detective Lange advised Mr. Alfaro others had said Mr. Alfaro was "right there when this happens . . . ." Detective Lange told Mr. Alfaro: "[T]hat's not necessarily a bad thing, okay? But I need to know, how close do you eventually get?"

Mr. Alfaro again claimed he did not participate in the melee. Detective Lange said: "[I] want you to know we've been doing this ever since this happened. So I also want you to know that we know a lot about you, okay? We know that other people call you [by a gang moniker], okay? And that you're also part of the crew. . . , okay? [¶] Now part of your association with that crew . . . makes it look kinda weird that you were around. So I know that you were either standing there at some point in time, did you hear a gunshot?" (*Sic.*) Mr. Alfaro admitted he was part of the crew. Detective Lange told Mr. Alfaro they were going to interview more people, including Richard. Detective Lange asked Mr. Alfaro whether Richard was going to tell them anything different. Mr. Alfaro said no.

Detective Turpin advised Mr. Alfaro as follows: "I want you to remember that the outcome of this investigation is gonna change many lives, okay, uhm, it's our opinion that people got caught up in the moment and in the end a lot of people screwed up. It could have been the alcohol, it could have been the weed, whatever, but there was a lot of people involved in this incident, and a lot of people's lives are gonna change. I – I want you to really, really think hard and think of what part of this investigation you're gonna

11

end up on. [¶] 'Cause I know that you've been taught values cause if you had no values, you wouldn't be going to school and you wouldn't be playing baseball. Because only people with heart play baseball and stay in school, so you wanna do the right thing, okay? I don't want to interview five more people and it come down to you being one of those people that pulled the strap or stabbed him or hit him with the board. [¶] Okay, if you were caught up in the mix and you were just being an idiot at that time and you got in that mix with a hit and a kick, we need to know right now."

As noted, Mr. Alfaro immediately responded, "I just hit him and kicked him." He went on to admit, "I was the one who chased him on the street." Moreover, Mr. Alfaro confessed, "I was the one who dropped him." Thus, as noted, Mr. Alfaro admitted chasing, punching and kicking Mr. LeBlanc. Mr. Alfaro denied knowing who had a gun. At the conclusion of the interview, Detective Turpin said: "I'm gonna take you down, your mom's downstairs, okay? Thanks for coming down here."

Whether Mr. Alfaro was in custody when he incriminated himself is a mixed question of law and fact. (*Thompson v. Keohane* (1995) 516 U.S. 99, 112-113; *People v. Ochoa* (1998) 19 Cal.4th 353, 401.) We apply the following standard of review: "'In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.)" (*People v. Thomas* (2011) 51 Cal.4th 449, 476-477; accord, *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 ["we accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was 'custodial.'"].)

Custodial interrogation means, "[Q]uestioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda v. Arizona, supra,* 384 U.S. at p. 444; accord, *People v. Moore* (2011) 51 Cal.4th 386, 394-395.) Our Supreme Court has held:

12

"'[C]ustody occurs if the suspect is physically deprived of his freedom of action in any way or is led to believe, as a reasonable person, that he is so deprived.' ([*People v. Arnold* (1967)] 66 Cal.2d [438,] 448[, overruled on a different point in *Walker v. Superior Court* (1988) 47 Cal.3d 112, 123].)" (*Green v. Superior Court* (1985) 40 Cal.3d 126, 133-134; accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1167.)  Whether an interrogation is custodial is an objective inquiry.  (*J.D.B. v. North Carolina* (2011) 564 U.S. __, __ [131 S.Ct. 2394, 2402]; *People v. Linton, supra,* 56 Cal.4th at p. 1167.)  The United States Supreme Court has held the inquiry involves two discrete questions: "'[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave[?]'" (*J.D.B. v. North Carolina, supra,* 564 U.S. at p. __ [131 S.Ct. at p. 2402]; accord, *Thompson v. Keohane, supra,* 516 U.S. at pp. 112-113; *People v. Ochoa, supra,* 19 Cal.4th at pp. 401-402.)

A court must consider all of the circumstances surrounding the interrogation.  As our Supreme Court explained in *People v. Moore, supra,* 51 Cal.4th at page 395: "Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.  (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400; *People v. Boyer* (1989) 48 Cal.3d 247, 271[, disapproved on another point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1].)  When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation.  [*People v. Boyer, supra,* 48 Cal.3d at p. 272.]  All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present."  Further, in cases as here involving juveniles, the custody analysis must include some consideration of the interviewee's age.  (*J.D.B. v. North Carolina, supra,* 564 U.S. at p. __ [131 S.Ct. at p. 2405.])  In *J.D.B.,* the United States Supreme Court concluded:  "[W]e hold that so long as the child's age was known to the officer at the time of police questions, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective

13

nature of that test. This is not to say that a child's age will be a determinative, or even a significant, factor in every case. . . . It is, however, a reality that courts cannot simply ignore." (*Id.* at p. __ [131 S.Ct. at p. 2406, fn. omitted]; see *People v. Nelson* (2012) 53 Cal.4th 367, 383, fn. 7.)

The following factors lead us to conclude the trial court did not err in finding Mr. Alfaro was not in custody for purposes of *Miranda v. Arizona*, *supra*, 384 U.S. at page 444. Mr. Alfaro was not under arrest. (*Stansbury v. California* (1994) 511 U.S. 318, 322 ["a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'"]; *California v. Beheler* (1983) 463 U.S. 1121, 1125 [same].) Mr. Alfaro acknowledged he was present in the police station interview room freely and voluntarily. One of the doors to the interview room was ajar during the discussion and voices and laughter of other people could be heard during the interview. (*Green v. Superior Court*, *supra*, 40 Cal.3d at p. 136 ["Notwithstanding the lock on the interview room door, the evidence does not compel the conclusion that defendant could not have left whenever he had wanted during the interview."].) Defendant was not handcuffed nor otherwise restrained in the interview room. (*People v. Stansbury*, *supra*, 9 Cal.4th at p. 834.) Mr. Alfaro was never told he was under arrest, in custody or a suspect. (*Green v. Superior Court*, *supra*, 40 Cal.3d at p. 135.) The fact no warnings were given is circumstantial evidence Mr. Alfaro was not a suspect. (*People v. Holloway* (1990) 50 Cal.3d 1098, 1115, disapproved in part by *People v. Stansbury*, *supra*, 9 Cal.4th at p. 830, fn. 1; see *People v. Aguilera*, *supra*, 51 Cal.App.4th at p. 1163, fn. 6.) Mr. Alfaro was repeatedly told the fact others had said he was present when the killing occurred was not necessarily a bad thing. The two detectives never expressed any belief Mr. Alfaro was guilty nor did they ask questions in an accusatory, aggressive or confrontational way. (*People v. Stansbury*, *supra*, 9 Cal.4th at p. 834; *People v. Spears* (1991) 228 Cal.App.3d 1, 25.) The detectives politely indicated they wanted Mr. Alfaro to tell the truth. And when Mr. Alfaro denied much specific knowledge about the killing, the detectives said they wanted him to tell the truth

14

and provide more information.  Once the interview was completed, after a brief delay, Mr. Alfaro left the police station with his mother.

The fact that after a while, the two detectives politely expressed skepticism with some aspects of Mr. Alfaro's statements, were not evidence he was in custody.  (*People v. Moore*, *supra*, 51 Cal.4th at pp. 403-404.)  Further, the fact the interview occurred at a police station is not dispositive.  (*Howes v. Fields* (2012) 565 U.S. ___, ___ [132 S.Ct. 1181, 1188] [an advisement of rights is not required "'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect'"]; *People v. Stansbury*, *supra*, 9 Cal.4th at p. 834 [questioning after entering a room in the jail section of a police station which required passage through locked doors was not custodial].)  A coercive environment is insufficient by itself to create a duty to give the required advisements.  (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495; *Green v. Superior Court*, *supra*, 40 Cal.3d at p. 135.)  Nor is the two-hour duration of the questioning in an interview room dispositive.  (*Green v. Superior Court*, *supra*, 40 Cal.3d at pp. 131-135; see *People v. Spears, supra*, 228 Cal.App.3d at p. 27.)  And Mr. Alfaro offered no testimony as to whether he believed he was free to leave.  (*Green v. Superior Court*, *supra*, 40 Cal.3d at p. 135.)  Taken collectively and viewed objectively, a 17-year-old would not have felt restrained to the degree associated with a formal arrest.  (See *Yarborough v. Alvarado* (2004) 541 U.S. 652, 663-666; *People v. Moore, supra,* 51 Cal.4th at p. 402.)

## C.  Jury Instruction: Natural And Probable Consequences

### 1.  Instruction, pending case and legal test

The jury was instructed defendants could be guilty of aiding and abetting a murder on a natural and probable consequences theory.  The instruction did not require the jury to find that *premeditated* murder, rather than just murder, was a natural and probable consequence of the aggravated assault.  During deliberations the jury inquired,

"Clarification regarding the difference between first and second degree murder with regard to an aid [and] abetter [*sic*] and/or natural and probable consequences." The trial court responded by going back over the relevant instructions.

Defendants assert the jury should have been required to decide, as an element of the natural and probable consequences analysis, that premeditated murder was the target offense. In other words, defendants argue that merely advising the jury the target offense must be merely murder, as distinguished from first degree murder, was federal constitutional error. This issue is presently pending before our Supreme Court in *People v. Chiu* (C063913, April 23, 2012) 2012 Cal.App. Unpub. LEXIS 3044, review granted August 15, 2012, S202724.) In *Chiu,* the Court of Appeal for the Third Appellate District held, "[T]he instructions were deficient because they failed to inform the jury it needed to decide whether first degree murder, rather than just 'murder,' was a natural and probable consequence of the target offense." (*People v. Chui, supra,* 2012 Cal.App. Unpub. LEXIS 3044 *26.) Our Supreme Court granted review to consider the following issue, "Does a conviction for first degree murder as an aider and abettor under the natural and probable consequences doctrine require that premeditated murder have been a reasonably foreseeable consequence of the target crimes or only that murder have been such consequence?" (<https://appellatecases.courtinfo.ca.gov/search/case/main CaseScreen.cfm?dist+0doc_id =2014866&doc_no=S202724>) Our review is de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) We find no instructional error.

The test for aider and abettor liability on a natural and probable consequences theory is an objective one. As our Supreme Court explained in *People v. Medina* (2009) 46 Cal.4th 913, 920: "'"A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. (*People v. Prettyman* [(1996)] 14 Cal.4th [248,] 260-262.)' (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133.) Liability under the natural and probable consequences doctrine

16

'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 535.)" (Accord, *People v. Favor* (2012) 54 Cal.4th 868, 874.)

## 2. *Chiu*

The *Chiu* court relied in part on its own decision in *People v. Hart* (2009) 176 Cal.App.4th 662, 673. The two offenses in *Hart* were attempted robbery and willful, deliberate and premeditated attempted murder. The attempted robbery was the target offense; the intended crime. The nontarget offense was the attempted willful, deliberate and premeditated murder. At issue, in part, was whether the attempted willful, deliberate and premeditated murder was the natural and probable consequence of the attempted robbery. *Hart* held the jury, in order to convict of attempted willful, deliberate and premeditated murder, must find that offense was the natural and probable consequence of the attempted robbery. *Hart* held the jury must be so instructed. (*Id.* at pp. 672-673.) Our Supreme Court disapproved *Hart* in *People v. Favor, supra,* 54 Cal.4th at pages 872, 875-880. Therefore, *Hart* is no longer an accurate statement of California law in the context of whether attempted robbery may serve as the basis for a willful, deliberate and premeditated attempted murder conviction.

Moreover, our Supreme Court rejected the present argument in the context of attempted murder in *People v. Favor, supra,* 54 Cal.4th at pages 871-872, 874-880. Defendants argue *Favor* was incorrectly decided. That issue is not one this court may decide. (*People v. Letner & Tobin* (2010) 50 Cal.4th 99, 197-198; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Defendants further assert *Favor,* which involved attempted murder, should not be extended to this case, which involves murder. As discussed below, we disagree. We conclude the jury was properly instructed. We follow the reasoning of: *People v. Lee* (2003) 31 Cal.4th 613, 616 (*Lee*), *People v. Cummins* (2005) 127 Cal.App.4th 667, 680-681 (*Cummins*) and *People v. Favor, supra,*

17

54 Cal.4th at pages 871-872, 874-880. We note defendant does not argue a necessarily included offense instruction should have been given. Therefore, we need not consider whether *People v. Woods* (1992) 8 Cal.App.4th 1570, 1586-1587, remains an accurate statement of California law. We now turn to *Lee*, *Cummins* and *Favor*.

### 3. *Lee*

In *Lee, supra,* 31 Cal.4th at page 620, our Supreme Court considered, "[Whether the statute governing punishment for *attempted murder*, section 664, subdivision (a) (664(a))] requires that in order to be punished with life imprisonment for attempted murder as an aider and abettor, an individual must personally act with willfulness, deliberation, and premeditation." Section 664(a) mandates increased punishment for an attempted murder when it is willful, deliberate and premeditated. (*People v. Bright* (1996) 12 Cal.4th 652, 655-657, disapproved on another point in *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6; see *People v. Muhammad* (2007) 157 Cal.App.4th 484, 493.) Section 664(a) states in part: "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole." In *Lee,* our Supreme Court noted that in section 664(a), the Legislature did not distinguish between a direct perpetrator and an aider and abettor. Our Supreme Court concluded therefore, "[S]ection 664(a) properly must be interpreted to require only that the murder attempted was willful, deliberate, and premeditated, but not to require that an attempted murderer personally acted willfully and with deliberation and premeditation, even if he or she is guilty as an aider and abettor." (*Lee, supra,* 31 Cal.4th at p. 616; see also pp. 620-625.)

*Lee* did not involve the natural and probable consequences doctrine. Our Supreme Court noted in *dictum*, however: "Of course, where the natural-and-probable-consequences doctrine does apply, an attempted murderer who is guilty as an aider and abettor may be less blameworthy. In light of such a possibility, it would not have been

18

irrational for the Legislature to limit [the increased punishment under] section 664(a) only to those attempted murderers who personally acted willfully and with deliberation and premeditation. But the Legislature has declined to do so." (*Lee, supra,* 31 Cal.4th at pp. 624-625.)

*Lee* also observed in relation to an attempted murderer's blameworthiness that punishment need not be "finely calibrated" to a criminal's mental state. (*Lee, supra,* 31 Cal.4th at p. 627.) The court stated: "Although defendants . . . argue that an attempted murderer who is guilty as an aider and abettor, but who did not personally act with willfulness, deliberation, and premeditation, is insufficiently blameworthy to be punished with life imprisonment, their argument . . . ignores the very substantial blameworthiness of even this sort of attempted murderer—necessarily so in the general case, and possibly so even under the natural-and-probable-consequences doctrine. More fundamentally, defendants' argument seems predicated on an assumption that punishment must be finely calibrated to a criminal's mental state. Such an assumption is unsound. Punishment takes account not only of the criminal's mental state, but also of his or her conduct, the consequences of such conduct, and the surrounding circumstances. [Citations.] Such circumstances may include the fact that the murder attempted was willful, deliberate, and premeditated." (*Ibid.*) In *People v. Favor, supra,* 54 Cal.4th at page 878, moreover, our Supreme Court subsequently observed: "[In *Lee*], we noted that even in the case of aiders and abettors under the natural and probable consequences doctrine, punishment need not be finely calibrated to the criminal's mens rea. It takes account of other valid penological considerations, such as the defendant's conduct, the consequences of such conduct, and the surrounding circumstances, including the fact that the murder attempted was willful, deliberate, and premeditated. (*Lee, supra,* 31 Cal.4th at p. 627.)"

4. *Cummins*

19

In *Cummins, supra,* 127 Cal.App.4th at pages 680-681, Division One of the Court of Appeal for this appellate district extended the analysis in *Lee* to the natural and probable consequences doctrine. The Court of Appeal considered a premeditated attempted murder conviction under the natural and probable consequences doctrine where the victim was pushed off a cliff. One defendant argued it was error not to inform the jury it had to find a *premeditated* attempted murder was a natural and probable consequence of robbery or carjacking. (*Id.* at p. 680.) The Court of Appeal disagreed: "We see no reason, under the facts of this case, to depart from the reasoning of the *Lee* court in a situation that applies the natural and probable consequences doctrine. As noted above, [defendant] was a willing and active participant in all the steps that led to the attempt on [the victim's] life. Although the evidence did not conclusively determine which defendant had physical contact with the victim when he was pushed, certainly [defendant's] conduct makes him no less blameworthy than [his coperpetrator]. The jury here was properly instructed on the elements of attempted premeditated murder and, based on the evidence, found the attempt on [the victim's] life was willful, deliberate, and premeditated. Nothing more was required." (*Id.* at pp. 680-681.)

5. *Favor*

As noted above, in *People v. Favor, supra,* 54 Cal.4th at pages 871-872, 874-880, our Supreme Court resolved the conflict between *Cummins* and *Hart*. We have previously described the natural and probable consequence instructional error issue litigated in *Hart*. The issue was whether the target offense of attempted robbery could serve as the basis for an attempted robbery and willful, deliberate and premeditated murder conviction. (*People v. Hart, supra,* 176 Cal.App.4th at p. 673.) In *Favor,* our Supreme Court followed *Cummins* and disapproved *Hart*. Our Supreme Court held: "[O]nce the jury finds that an aider and abettor, in general or under the natural and probable consequences doctrine, has committed an attempted murder, it separately

20

determines whether the attempted murder was willful, deliberate, and premeditated. [¶] Under the natural and probable consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense. It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation." (*People v. Favor, supra,* 54 Cal.4th at pp. 879-880.)

### 6. Conclusion

The reasoning of the foregoing cases is applicable in the present context. A defendant may be guilty of murder as an aider and abettor even if he or she did not personally act willfully and with deliberation and premeditation. (See *People v. Favor, supra,* 54 Cal.4th at p. 877; *People v. Lee, supra,* 31 Cal.4th at p. 616.) An aider and abettor's liability does not require premeditation as a mental state. (See *People v. Favor, supra,* 54 Cal.4th at p. 877; *Lee, supra,* 31 Cal.4th at pp. 616-617.) As our Supreme Court discussed in *Lee*: "Although defendants . . . argue that an attempted murderer who is guilty as an aider and abettor, but who did not personally act with willfulness, deliberation, and premeditation, is insufficiently blameworthy to be punished with life imprisonment, their argument . . . ignores the very substantial blameworthiness of even this sort of attempted murderer—necessarily so in the general case, and possibly so even under the natural-and-probable-consequences doctrine. More fundamentally, defendants' argument seems predicated on an assumption that punishment must be finely calibrated to a criminal's mental state. Such an assumption is unsound. Punishment takes account not only of the criminal's mental state, but also of his or her conduct, the consequences of such conduct, and the surrounding circumstances. [Citation.] Such circumstances may include the fact that the murder attempted was willful, deliberate, and premeditated." (*Lee, supra,* 31 Cal.4th at p. 627.) Moreover, the nature of aider and abettor liability is derivative. The aider and abettor's liability attaches to the crime actually committed.

21

Here, the jury could find defendants, members of a gang who detested African Americans, participated in a coordinated vicious assault on Mr. LeBlanc. Further, the jury could conclude the stabbing and shooting, the death inducing conduct, was perpetrated willfully, deliberately and with premeditation. If the jury found the foregoing, then defendants may be liable for Mr. LeBlanc's first degree murder on a natural and probable consequences theory. The degree of the murder committed, turning on the perpetrator's mental state, need not be a natural and probable consequence of the target crime. And this is because the degree of the murder relates only to punishment. The aider and abettor's mental state as it relates to the degree of the homicide is not in issue under the natural and probable consequences doctrine. The question is whether a reasonable person in the defendant's position should have foreseen that a murder might result. (*People v. Favor, supra,* 54 Cal.4th at pp. 871-872, 874-880; *Lee, supra,* 31 Cal.4th at pp. 616, 620-627; *Cummins, supra,* 127 Cal.App.4th at pp. 680-681.)

### D. Defense Instruction Concerning Youthfulness

Defendants argue the jury should have been instructed on the subject of their youthfulness as follows: "Some of the defendants in this case may have been under 18 years old at the time of the acts charged in this case. Children are not held to the same standards of care as adults. In accessing [*sic*] whether the prosecution has proved whether a defendant under the age of 18 is guilty of any crimes, when the jury instructions refer to 'a reasonable person' or 'a person of average disposition,' [the jury] must consider that 'person' to be a 'reasonable child' or 'child of average disposition' of like age, experience, and development who was facing a similar situation to that of that minor defendant." Mr. Alfaro requested the foregoing instructions. The trial court denied the request. On appeal, defendants contend it was reversible error to fail to so instruct. We disagree. No such instruction is required. Mr. Alfaro cannot set up his own standard of conduct based on his youth. (See *People v. Steele* (2002) 27 Cal.4th 1230,

22

1253; *People v. Morse* (1969) 70 Cal.2d 711, 735.)  No statutory or decisional authority required the trial court to apply a reasonable juvenile standard in the present case.

### E.  Sufficiency Of The Evidence As To Mr. Prado

#### 1.  Mr. Prado's arguments and the standard of review

Mr. Prado challenges the sufficiency of the evidence in three respects.  First, he argues there was insufficient evidence he had a specific intent to kill as a direct aider and abettor.  Second, Mr. Prado argues the evidence was insufficient to convict him under a natural and probable consequences theory.  Third, he asserts the evidence failed to establish he committed the assault with the intent to benefit the gang.

Our Supreme Court has set forth the applicable standard of review.  "Substantial evidence is evidence that is '"reasonable in nature, credible, and of solid value."' (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' (*People v. Davis* (1995) 10 Cal.4th 463, 509.)  We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  'The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on "'isolated bits of evidence.'" [Citation.]' (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.)" (*People v. Medina, supra,* 46 Cal.4th at p. 919; accord, *In re V.V.* (2011) 51 Cal.4th 1020, 1026.)

#### 2.  Direct aider and abettor's criminal intent

Mr. Prado challenges the sufficiency of the evidence he was guilty of murder as a direct aider and abettor. Mr. Prado concedes he kicked Mr. LeBlanc with force likely to cause great bodily injury. He admits that in doing so he displayed a conscious disregard for human life. Mr. Prado admits accompanying Mr. Delgado, who stabbed Mr. LeBlanc, before the party. Also, Mr. Prado admits leaving police custody with Mr. Delgado. He asserts, however, that his actions did not rise to the level of a specific intent to kill or to aid the perpetrators of the killing. Mr. Prado reasons there was no evidence he was aware anyone was going to perpetrate a stabbing or shooting, or that he intended to assist them in doing so.

Our Supreme Court has held: "To be guilty of a crime as an aider and abettor, a person must 'aid[ ] the [direct] perpetrator by acts or encourage[ ] him [or her] by words or gestures.' (*People v. Villa* (1957) 156 Cal.App.2d 128, 134; accord, *People v. Gonzales* (1970) 4 Cal.App.3d 593, 600; see generally 1 Witkin & Epstein, Cal. Criminal Law [(3d ed. 2000)] Introduction to Crimes, § 78, p. 124.) In addition . . . the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. (*People v. Beeman* (1984) 35 Cal.3d 547, 560; accord, e.g., *People v. Prettyman, supra,* 14 Cal.4th at p. 259; *People v. Croy* (1985) 41 Cal.3d 1, 11–12.) When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[ ] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' (*People v. Beeman, supra,* 35 Cal.3d at p. 560.) Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. (See *People v. McCoy* [(2001)] 25

24

Cal.4th [1111,] 1118.)" (*People v. Lee, supra,* 31 Cal.4th at pp. 623-624; accord, *People v. Maciel* (2013) 57 Cal.4th 482, 519-520.)

Mr. Prado actively participated in the initial and subsequent attacks on Mr. LeBlanc. Mr. Prado encouraged the assault and displayed a hatred of African-Americans by saying, "Get the myate." The assaults were severe and relentless. At one point, Mr. LeBlanc escaped temporarily. But Mr. Prado and others chased Mr. LeBlanc down the street. Mr. Prado admittedly observed a large group of people "stomping" on Mr. LeBlanc. He heard people saying, "Fuck this nigga," and "myate." Mr. Prado saw blood coming out of Mr. LeBlanc's mouth. Mr. Prado joined in the assault as Mr. LeBlanc crawled on the ground. Mr. Prado admitted kicking Mr. LeBlanc twice. Mr. Casas saw Mr. Prado "stomping" on Mr. LeBlanc with force. Mr. Casas testified: "Q What did you see? [¶] A I seen [Prado] stomping him with force. [¶] Q Describe how he was doing that. [¶] A Like grabbing his hands toward the fence. [¶] Q What do you mean by that? [¶] A Like giving himself more force to stomp him harder. . . . [¶] Q . . . [A]s he was holding the fence, you saw him stomp? [¶] A Yeah." Mr. LeBlanc suffered numerous blunt force injuries to his head including bruises on his forehead and eyelid, ear and eyebrow lacerations, broken ear cartilage, and a fractured nose. Certain angular abrasions were consistent with being stomped with a shoe. Mr. Prado admittedly went to the party with Mr. Delgado, who stabbed Mr. LeBlanc. Further, Mr. Prado admittedly went to Mr. Delgado's house after leaving the police station in the hours following the murder. The jury could reasonably conclude Mr. Prado pursued and intended to kill Mr. LeBlanc.

### 3. Natural and Probable Consequence

Mr. Prado argues the evidence was also insufficient to convict him under a natural and probable consequences theory. As our Supreme Court has explained: "'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget

25

offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. (*People v. Prettyman*[, *supra,*] 14 Cal.4th [at pp.] 260–262.)' (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133.) Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' (*People v. Nguyen*[, *supra,*] 21 Cal.App.4th [at p.] 535.) [¶] '[A]lthough variations in phrasing are found in decisions addressing the doctrine— "probable and natural," "natural and reasonable," and "reasonably foreseeable"—the ultimate factual question is one of foreseeability.' (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.) Thus, '"[a] natural and probable consequence is a foreseeable consequence". . . .' (*Ibid.*) But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough . . . .' (1 Witkin & Epstein, Cal. Criminal Law (2d ed.1988) § 132, p. 150.)' (*People v. Nguyen, supra,* 21 Cal.App.4th at p. 535.) A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case (*ibid.*) and is a factual issue to be resolved by the jury. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376; *People v. Godinez* (1992) 2 Cal.App.4th 492, 499.)" (*People v. Medina, supra,* 46 Cal.4th at p. 920.)

The jury could reasonably conclude the stabbing and shooting were natural and probable consequences of the assault. Mr. Prado was a member of or affiliated with the gang. The gang regularly committed violent crimes. Mr. LeBlanc brandished a gun following a verbal altercation with gang associates. The altercation occurred in the gang's territory. The racially biased gang members and affiliates viewed Mr. LeBlanc's behavior as disrespecting the gang. As Detective Freeman testified, disrespect must be avenged. The gang members and associates retaliated by attacking Mr. LeBlanc. After a bystander intervened in the initial assault, Mr. Prado chased Mr. LeBlanc down the street where the assault was renewed. Mr. Prado knowingly and intentionally participated in a

26

racially and gang motivated attack that preceded the stabbing and shooting. The attack was brutal, vicious and relentless. At one point, Mr. Prado grabbed ahold of a fence in order to gain leverage to stomp on Mr. LeBlanc with increased force. The beatings, stabbings and shooting all followed in close succession. Prior knowledge others were armed with weapons was unnecessary to support Mr. Prado's conviction as an aider and abettor. (*People v. Medina, supra,* 46 Cal.4th at p. 921; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 11; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.) The jury could rationally find a reasonable person in Mr. Prado's position would or should have foreseen escalation of the attack to a deadly level. (See *People v. Medina, supra,* 46 Cal.App.4th at pp. 919-928; *People v. Gonzales, supra,* 87 Cal.App.4th at pp. 10-11; *People v. Montes, supra,* 74 Cal.App.4th at p. 1056; *People v. Olguin, supra,* 31 Cal.App.4th at p. 1376; *People v. Godinez, supra,* 2 Cal.App.4th at pp. 495-500; *People v. Montano* (1979) 96 Cal.App.3d 221, 226.)

### 4. Gang Enhancement

Mr. Prado's final evidentiary insufficiency claim addresses the gang enhancement. However, there was substantial evidence the crime was committed to benefit the gang. Mr. Prado was associated with if not a member of the gang. Mr. Prado's friend, Mr. Delgado, was an admitted associate or member of the gang as well. Detective Freeman testified, based on hypothetical facts tracking those of this case, that Mr. LeBlanc's murder benefited the gang. Detective Freeman explained: "When an individual disrespects members of a neighborhood, they're going to be dealt with. And this is . . . [the gang] responding and their associates responding that this is what will happen if you disrespect us in our neighborhood . . . ." This was substantial evidence supporting the gang enhancement. (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1170-1172; *People v. Albillar* (2010) 51 Cal.4th 47, 59-62.)

### F. Natural and Probable Consequences Theory

27

Mr. Prado argues the natural and probable consequences theory cannot support a first degree murder conviction. Mr. Prado reasons that natural and probable consequences liability is a form of implied malice and first degree murder requires express malice. Mr. Prado contends using the natural and probable consequences doctrine to support a first degree murder conviction violates his equal protection and due process rights. Our Supreme Court has upheld the use of a natural and probable consequences theory to support a first degree murder conviction. (E.g., *People v. Maciel, supra,* 57 Cal.4th at pp. 519-520; *People v. Gonzales* (2011) 52 Cal.4th 254, 297-300; *People v. Medina, supra,* 46 Cal.4th at pp. 919-928.) We are bound by that authority. (*People v. Johnson* (2012) 53 Cal.4th 519, 527-528; *People v. Letner & Tobin, supra,* 50 Cal.4th at pp. 197-198; *Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455.)

### G. Attempted Murder As A Lesser Included Offense Instruction

Mr. Prado argues the trial court should have instructed the jury on attempted murder as a lesser included offense. Our Supreme Court has held: "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (E.g., 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 53, pp. 262–263; see, e.g., *People v. Swain* (1996) 12 Cal.4th 593, 604-605.)" (*People v. Lee, supra,* 31 Cal.4th at p. 623.) Mr. Prado argues the jury reasonably could have found he committed only attempted murder.

Mr. Prado reasons the jurors could find the kicking occurred without knowledge someone else would stab or shoot Mr. LeBlanc. It is true, as Mr. Prado contends, that a trial court must sua sponte instruct the jury on any lesser included offense that is supported by substantial evidence. (*People v. Whalen* (2013) 56 Cal.4th 1, 68; *People v. Waidla, supra,* 22 Cal.4th at p. 733.) However, the duty does not exist where there is no evidence the offense was less than that charged. (*People v. Smith* (2013) 57 Cal.4th 232,

28

240; *People v. Breverman* (1998) 19 Cal.4th 142, 154, 162.)  As our Supreme Court has held, "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  ([*People v. Flannel* (1979)] 25 Cal.3d 668, 684, fn. 12, original italics; see also *People v. Bacigalupo* (1991) 1 Cal.4th 103, 127; *People v. Ramos* (1982) 30 Cal.3d 553, 582.)  'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"' that the lesser offense, but not the greater, was committed.  ([*People v.*] *Flannel, supra,* [25 Cal. 3d] at p. 684, quoting *People v. Carr* (1972) 8 Cal.3d 287, 294; accord, [*People v. Barton* (1995)] 12 Cal.4th 186, 201, fn. 8 ['evidence that a reasonable jury could find persuasive'].)"  (*People v. Breverman, supra,* 19 Cal.4th at p. 162; accord, *People v. Smith, supra,* 57 Cal.4th at p. 239.)

Here, Mr. Prado's actions, which went far beyond merely kicking Mr. LeBlanc, were consistent with an intent to kill.  There was no substantial evidence he took only *ineffectual acts* towards doing so.  There was no substantial evidence from which a reasonable jury could conclude Mr. Prado was guilty of attempted murder but not of murder.  In any event, any alleged error was harmless.  In a noncapital case, we review jury lesser included instructional error to determine whether there is a reasonable probability of a different result. (Cal. Const., art. VI, § 13; *People v. Breverman, supra,* 19 Cal.4th at pp. 149, 178; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  It is undisputed Mr. LeBlanc died.  This is no basis for concluding Mr. Prado took only ineffectual acts in the events leading up to Mr. LeBlanc's death.  There is no reasonable probability of a different result had the jurors been instructed on the included offense of attempted murder.

H.  Cruel And Unusual Punishment

29

Mr. Prado received a sentence of 50 years to life. Mr. Prado argues his 50-year-to-life sentence was cruel and unusual under both the state and federal Constitutions. (Cal. Const. Art. I, § 17 [cruel *or* unusual]; U.S. Const., 8th Amend.) Mr. Prado reasons that unless the jury found him guilty as a direct aider and abettor, he was far less culpable than the actual killers. That contention is without merit. (*People v. Gonzales, supra,* 87 Cal.App.4th at pp. 18-19.)

## I. Cumulative Error

Defendants contend they are entitled to reversal because of cumulative error. We find no prejudicial legal error. Therefore, we reject defendants' argument the cumulative effect of all the errors requires reversal. (*People v. Jones* (2013) 57 Cal.4th 899, 981; *People v. Edwards* (2013) 57 Cal.4th 658, 746.)

## IV.  DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P.J.


We concur:



MOSK, J.



KRIEGLER, J.