[No. B169295. Second Dist., Div. One. Mar. 16, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD CUMMINS et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, III, IV–D, E, F and G.

## COUNSEL

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant Donald Cummins.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant Joseph Armond Kelly.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson and Michael W. Whitaker, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SUZUKAWA, J.**[*]—

### INTRODUCTION

After a jury trial, Donald Cummins was convicted of kidnapping during the commission of a carjacking (count 2) (Pen. Code, § 209.5, subd. (a)),[1] carjacking of a motor vehicle (count 3) (§ 215, subd. (a)), second degree robbery (count 4) (§§ 211, 212.5), five counts of burglary (counts 5–9)

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Unless stated otherwise, all further statutory references are to the Penal Code.

(§ 459), and unlawful driving or taking of a vehicle (count 10) (Veh. Code, § 10851, subd. (a)).

Cummins was sentenced to a determinate term as follows. The court imposed the upper term of five years for the robbery in count 4 and a consecutive term of eight months for each of the burglary charges in counts 5 through 9. Cummins received a consecutive indeterminate term of life with the possibility of parole for the kidnapping charge in count 2. The sentences on counts 3 and 10 were stayed pursuant to section 654. This resulted in an aggregate term of life plus eight years and four months in state prison.

In a separate trial, Joseph Kelly was convicted of attempted premeditated murder (count 1) (§§ 664, 187, subd. (a)), kidnapping during the commission of a carjacking (count 2) (§ 209.5, subd. (a)), carjacking of a motor vehicle (count 3) (§ 215, subd. (a)), second degree robbery (count 4) (§§ 211, 212.5), five counts of burglary (counts 5–9) (§ 459), and unlawful driving or taking of a vehicle (count 10) (Veh. Code, § 10851, subd. (a)). The jury also found in the commission of the attempted murder, Kelly personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (a)).

Kelly was sentenced to a determinate term consisting of the upper term of five years on the robbery in count 4 and a consecutive term of eight months for each of the burglary charges in counts 5 through 9, and a three-year term for the section 12022.7 allegation in count 1. He received two consecutive indeterminate sentences of life with the possibility of parole on counts 1 and 2. The sentences on counts 3 and 10 were stayed pursuant to section 654. Kelly received an aggregate term of two life terms and 11 years and 4 months in the state prison.

In the published portion of the opinion, we reject Kelly's contentions that the evidence is insufficient to support his attempted murder conviction; the court erroneously instructed the jury regarding whether the target crimes of robbery and carjacking were complete when the attempted murder occurred, and whether an attempted premeditated murder was a natural and probable consequence of the target crimes; and the court erred in imposing consecutive sentences in violation of section 654.

In the unpublished portion of the opinion, we reject defendants' remaining contentions except the following: we reverse defendants' burglary convictions because the prosecution's theory of burglary is not recognized by California law; we reverse defendants' carjacking convictions because they are lesser included crimes to kidnapping while committing a carjacking; and, as conceded by the Attorney General, we strike Kelly's section 12022.7 great bodily injury enhancement.

In all other respects, we affirm the judgments. Although none of Cummins's issues warrant publication, to avoid repetition, we include the facts from his trial in the published portion of the case, because, other than as noted, the evidence from the two trials was similar.

# I

## CONTENTIONS ON APPEAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# II

## FACTS

### A. *CUMMINS TRIAL*

#### *The Prosecution Case*

On January 6, 2002, at about 10:00 p.m., Joseph Taglieri was stopped at a red light in Hollywood while driving his teal Honda Civic. He was approached on the driver's side by two men, later identified as Donald Cummins and Joseph Kelly (defendants). Defendants were able to force their way into the car and Taglieri was pushed into the back seat. Kelly got into the driver's seat and Cummins, armed with a revolver, got into the back seat with the victim. Cummins pointed the gun at Taglieri while Kelly drove from the location. The car was stopped on a side street, Kelly bound Taglieri's hands behind his back, and Taglieri was placed in the trunk. Before being put into the trunk, Taglieri was ordered to give defendants his wallet, which contained cash, two credit cards, and an ATM card. When asked, he gave one of the defendants the correct personal identification number (PIN) for the ATM card. Taglieri also had a tote bag, camera, cell phone, calculator, organizer, a Lo-jack identification card, registration for the vehicle, and proof of insurance in the car. At some point, one of the defendants applied a taser gun to Taglieri's person. He believed Kelly did this, but was not certain.

The car was driven around, by Taglieri's estimate, for what seemed like a couple of hours and made several stops. Taglieri was able to hear a third male voice inside the car. The car was stopped again and Taglieri was let out of the trunk near a cliff. He noticed there was another male with defendants. The men removed the tape from Taglieri's hands and ordered him to climb under a fence. He was ordered to walk and told if he turned around he would be

---

*See footnote, *ante*, page 667.

shot. Although he could hear voices behind him, he could not tell who was speaking to him. Taglieri's next memory was speaking to detectives in the hospital.

On January 7, about 7:00 a.m., Kenneth Atkins, a lifeguard, found Taglieri at the bottom of the cliff. Taglieri could not tell Atkins his name, date of birth, or where he was. He was marginally coherent. In response to questions, Taglieri was able to give some information in bits and pieces. He said he had been walking on the cliff at around 2:00 a.m., when someone approached, took his wallet, and pushed him off the cliff. Taglieri had numerous cuts on his face and abrasions on his elbows and hands. He had blood caked all over his face. Taglieri was transported by helicopter to the hospital.

On January 8, 2002, Detective Michael Margolis took a statement from Taglieri at the hospital. Taglieri told him he was at the cliff stargazing when a man came up behind him and pushed him off the cliff. He could not give a physical description of his assailant. The detective was only able to get a few sentences out of Taglieri, who also said his memory was cloudy and he might remember more later. The detective noted Taglieri was "pretty banged up."

On January 9, 2002, at about 10:00 a.m., Phoenix (Arizona) Police Officers Cory Figueroa and Andrew Woyna conducted a traffic stop on a Honda Civic, which was determined to be Taglieri's. This led to the arrest of the four occupants, defendants, Crystle Cala, and Joshua Parks. A search of the vehicle uncovered, among other things, the property Taglieri had in the vehicle at the time it was taken. (At trial, Taglieri identified the items as his.) In addition, officers found various credit card and ATM receipts.

Officer Jonathon Leatherman transported Cummins and Parks to the station. After the two men were removed from the vehicle, the officer conducted a routine search of the backseat. He found a room key for the Sahara Hotel in Las Vegas and three debit or credit cards in the name of Joseph Taglieri underneath the seat where Cummins had been sitting. He gave the cards to Officer Woyna. When Officer Woyna showed the cards to Cummins, he pointed to a Washington Mutual debit card and said, "That's the one we were all using."

Crystle Cala testified Cummins was a friend and Kelly was her boyfriend. Cummins and Kelly were also friends. At the time of their arrest, Cala was pregnant with Kelly's baby. In January, she was staying in an abandoned building with, among others, defendants and Joshua Parks.

On January 7, at about 2:10 a.m., defendants and Parks came to the building and told Cala to get her things because they were leaving. Prior to

their arrival, Cala had smoked some marijuana. The four individuals left the building and got into a Honda Civic. She knew the vehicle did not belong to anyone in the group and Cummins told her they were going on a joyride. The car left, with Kelly in the driver's seat, Cummins in the front passenger seat, and Parks and Cala in the back. They were on their way to Florida to visit Kelly's brother.

The group stopped at a truck stop in Ontario and made some purchases. Cummins and Parks went to an ATM machine and returned with approximately $400.00. Kelly told her they had obtained the PIN from the victim. They stopped for the night at the Bun Boy Motel in Baker.

Cummins spoke about the events surrounding the acquisition of the Honda several times. The first time was at the motel in Baker. Cala heard Cummins say he and Kelly "picked up a guy and they hog-tied him, they tased him, and threw him in the trunk of his own car, and they drove to San Pedro." Cummins went on to say they got the person out of the trunk and untied his hands. He, Cummins, then pushed the person off the cliff. The person fell, hit his head on a storm drain and caught himself on a rock or the drain. Cummins threatened to shoot the person if he did not let go. The person complied and fell down further. She heard Cummins say he had used a ".22" during the robbery, but she did not see a gun during the trip.

They stayed in Baker for about four hours and left for Las Vegas. On the way, they stopped and made some purchases. Once in Las Vegas, the group checked in at the Sahara Hotel. The next day, they started for Arizona. En route, Kelly used the ATM card to purchase gas and Cummins and Parks used the card to get $100.00 from an ATM. On approximately three occasions, she saw Cummins attempt and fail to get cash from a machine. She recalled hearing defendants talking about how the card was not working as much as they had hoped and how they hoped the victim was dead. The four were stopped by the police in Arizona.

A few days before the trip began on January 7, she heard Cummins discussing with Kelly the possibility of doing a "lick," street vernacular for a robbery or theft. Cummins told him he knew someone from whom he could get money and a car and needed help. Kelly agreed to assist him.

Cala told her version of the events to the officers who stopped her, a detective in Arizona, and Detective Margolis, one of the investigating officers in the case. She said her story remained consistent throughout. No one promised her anything in exchange for her truthful testimony. She was prosecuted for her participation, pled guilty, and was placed on probation after serving eight months in custody.

Marisol Amenero, a representative of Washington Mutual, testified several transactions involving Taglieri's ATM card were made on January 6 and 7. On the 6th, two cash withdrawals, each in the amount of $201.50, were made. On January 7, there were three withdrawals from Travel Center of America in Ontario, one in the amount of $202.50 and two in the amount of $102.50. The card was also used three times in Las Vegas. There were two cash withdrawals, one of $101.50 and another of $103.45, and a purchase for $58.98. Taglieri testified he did not authorize the use of his card for the aforementioned transactions.

On January 14, 2002, Detective Margolis took another statement from Taglieri. This statement was taken after Taglieri had spoken with Phoenix police. At trial, Taglieri identified Cummins as one of the perpetrators of the crimes. After the defense rested at trial, Detective Patricia Guerra developed some film from a disposable camera which had been recovered in Phoenix.

### The Defense Case

Joshua Parks testified he was living in an abandoned hamburger stand with defendants, Cala, and Parks' girlfriend, Crystal Dotson. On January 6, at about 8:00 p.m., he was near the Metro Link station with Cala. Approximately two hours later, defendants pulled up in a Honda Civic. He got into the car and the three men traveled to San Pedro. At a stop along the way, Cummins opened the back seat and Parks saw a man tied up in the trunk. At some point, he heard Kelly ask the man for his PIN. Twice, Kelly drove up to an ATM, conducted a transaction, and received cash. The first time, Kelly put the money in his pocket. The second time, Kelly gave the money to Cummins. With Kelly driving, the trio drove around the San Pedro area for about an hour before stopping at a cliff area. Kelly exited the car carrying a taser gun and Cummins came out with a handgun. Kelly opened up the trunk and pulled the victim out. Kelly and Cummins removed some of the restraints from the victim. Kelly pushed the victim under a fence and told Cummins and Parks to follow. They complied. Kelly untied the victim's hands and pushed him off the cliff. The victim managed to hang onto a pipe. Cummins got down with the gun and told him to let go or he would shoot. The victim let go of the pipe. The three men got back into the car and left.

Defendants and Parks eventually picked up Cala, drove to Baker, and then to Las Vegas. During the trip, Kelly had the taser gun and Cummins had the handgun. Somewhere near the California and Nevada border, Kelly threw both out of the car. The group spent a night in Las Vegas and drove to Phoenix. The next morning, they were stopped by the police.

Parks denied being offered anything in exchange for his testimony. He admitted having repeatedly lied to the police, both in Phoenix and Los

Angeles. After Los Angeles detectives confronted him with the information they had, his story changed. He also said defendants had threatened him and he was afraid to testify.

Parks pled no contest to several counts of burglary and one count of taking a motor vehicle without the owner's consent, for which he received a two-year prison sentence.

Los Angeles Police Officer Christopher Andrade testified he interviewed Taglieri at the hospital on January 7. Taglieri told him he had been walking on the cliffs when he was accosted by a man with a knife. The man demanded money, Taglieri gave him approximately $30, and the man pushed Taglieri off the cliff. At the time of the interview, Taglieri was hypothermic, disoriented, and unable to talk in complete sentences. It was difficult to get a clear statement.

## B. *KELLY TRIAL*

### *The Prosecution Case*

The prosecution relied on essentially the same evidence presented in the Cummins trial, although Cala did not testify about any statements Cummins made during the trip to Arizona. Specific facts relevant to Kelly's appeal will be set forth in detail below.

### *The Defense*

Brian Martin, an inmate in the Arizona State Penitentiary,[3] testified he had shared a cell with Cummins for two weeks. Cummins said he and Kelly had met Taglieri and he, Cummins, decided to rob Taglieri. Cummins made Taglieri get into the trunk, tasered him, and obtained his PIN to a bank account. When they got to the cliffs, defendants took Taglieri out of the trunk. Cummins said he was originally going to let Taglieri go, but he got an urge and pushed him off the cliff. Cummins also told Martin he was going to take Joe Kelly and his girlfriend down. This disturbed Martin because from what Cummins "told [Martin] they didn't have any knowledge. One wasn't even there. The female wasn't even there, and . . . Joe Kelly had no knowledge of what he [Cummins] was about to do." Martin denied receiving any benefit for his testimony.

Kelly testified he had known Cummins for about two years, but denied being close friends. On January 4, 2002, he saw Cummins speaking to

---

[3] Martin had been convicted of 11 felonies, all related to forgery, theft, and burglary.

Taglieri. On January 6, defendants went to purchase marijuana from Taglieri. Cummins did not say he had a gun and Kelly did not see one at that time. At approximately 10:00 p.m., Taglieri met defendants and the three men got into Taglieri's car and drove to a driveway across from a motel. Kelly got out of the car to relieve himself. When he returned, Cummins and Taglieri were talking about the marijuana sale. At that point, Cummins produced a .22-caliber revolver and a taser gun and ordered Taglieri out of the vehicle. Kelly stood there in shock. Taglieri asked Cummins if he was joking, and Cummins used the taser gun on him. Taglieri told Cummins where the marijuana was located. Cummins proceeded to tie Taglieri's hands behind his back and ordered him into the trunk of the car. Cummins gave Kelly the keys and said, "Let's go." Kelly felt he could not challenge Cummins because he was armed, so he got behind the wheel and drove.

Kelly drove for some time, not really knowing where to go. Cummins called Parks and they picked him up. Eventually, the men went to San Pedro. Taglieri was let out of the trunk, his bindings were cut and he was ordered to climb a fence and walk to the edge of the cliff. Cummins pushed Taglieri off the cliff. Kelly had no idea Cummins was going to do that. Taglieri held onto a drain pipe, but let go when Cummins threatened to shoot him. Cummins told Kelly, " 'Nobody talks.' " Kelly feared he might be shot and complied when Cummins gave him the keys and told him to return to Hollywood.

They picked up Cala, stopped in a motel in Baker, and stayed in a hotel in Las Vegas. He denied using the ATM card, but acknowledged Cummins gave him money for food. The group eventually arrived in Phoenix and were stopped by the police the following morning.

Kelly denied telling Cala he had planned a robbery or had planned to go to Florida to visit his brother, in that he had no such sibling. In fact, it was Cummins who had wanted to go to Florida. He denied asking Taglieri for his PIN, claiming it was Cummins who obtained that information.

On cross-examination, Kelly admitted he told detectives Cummins had never done him wrong. He admitted the group stopped at his mother's house on the way back to Hollywood, where he spoke to his sister. He was too afraid to call the police, although he acknowledged Cummins was outside the house while he spoke to his sister inside. He voluntarily returned to the car, stopped to pick up his girlfriend, and proceeded to drive out of the area with Cummins. By way of explanation, he noted a few months prior, Cummins got upset with him, pulled a knife and told him, if he "ever pissed [Cummins] off again [Cummins] would slit [Kelly's] throat." Kelly was also impeached with statements he made to the police. He said in the interview, Cummins was his best friend and he had known Cummins for about three or four years.

## III

## CUMMINS APPEAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV

## KELLY APPEAL

### A. *Sufficiency of the Evidence*

Kelly was convicted of the attempted murder of Taglieri under the established doctrine of "natural and probable consequences." (*People v. Prettyman* (1996) 14 Cal.4th 248, 260–263 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) He argues the evidence was insufficient to establish the attempted murder was a natural and probable consequence of the planned carjacking and robbery. Although he spends a considerable amount of time in his brief setting forth case law on the issue, he concedes there are a number of California cases which hold murder or attempted murder can be a natural and probable consequence of robbery. (*Id.* at pp. 262–263; *People v. Jones* (1989) 207 Cal.App.3d 1090, 1095–1098 [255 Cal.Rptr. 464]; *People v. Nguyen* (1988) 204 Cal.App.3d 181, 188–189 [251 Cal.Rptr. 40].)

■ In reviewing a case for sufficiency of the evidence, we "consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment." (*People v. Mincey* (2002) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d 388].) ■ In order to find a defendant liable under the "natural and probable consequences" doctrine, "the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*People v. Prettyman, supra,* 14 Cal.4th at p. 262, fn. omitted.) We are also guided by the principle "that whether the crime charged is the natural and probable consequence of the planned offense is a factual question for the jury to decide. [Citations.]" (*People v. Jones, supra,* 207 Cal.App.3d at p. 1095.)

---

*See footnote, *ante*, page 667.

Kelly insists the jury could not have applied the doctrine to the attempted murder charge because he could not have foreseen Cummins's act of pushing Taglieri off the cliff. He points to Martin's and his testimony wherein Cummins said he just got an urge to push the victim. Thus, it could not be reasonably anticipated that Cummins would, on his own, attempt to kill the victim after the target crimes had been completed. Clearly the jury rejected this evidence.

The testimony established the following. Kelly and his confederate, Cummins, who was armed with a handgun, forced their way into Taglieri's vehicle. Kelly entered on the driver's side after ordering the victim into the back. Kelly drove the vehicle to a side street, where he ordered Taglieri to hand over his wallet. Kelly bound the victim's hands and he was placed into the trunk. Kelly drove the car around for a couple of hours. During that time, he ordered the victim to give him the PIN to his ATM card and stopped at a shopping center in order to withdraw money from the victim's account. Later, Kelly produced a taser gun. The device was used on the victim, placed on his upper back and lower neck area. The victim was brought to a cliff area, where his binds were burned off. He was told to crawl under a fence. He remembers Kelly was doing most of the talking. He heard a voice "that sounded like [Kelly's] from behind [him] to keep walking, don't stop walking . . . . [¶] The last words I remember hearing were, 'Do not turn around. Turn around and you will be shot.' " When asked if he recognized the voice of the person who uttered the warning, the victim replied, "It sounded like it was the defendant's voice, Mr. Kelly." After the victim was pushed, Kelly picked up his girlfriend, Crystal Cala, and joined Cummins and Parks on a trip, which led them to Arizona. Along the way, they spent money stolen from Taglieri's account and behaved like a group on vacation until stopped by the Arizona police.

■ The above supports the finding Kelly was a full and willing accomplice in the robbery and carjacking of Taglieri. He participated, knowing Cummins was armed with a firearm. He produced a taser gun, which was used to inflict further injury to the victim. He drove the victim to the area where he was pushed off the cliff. He knowingly participated in the march to the edge of the cliff, where he directed the victim not to turn around at the risk of being shot. Notwithstanding which defendant actually pushed Taglieri, the event was not an unanticipated surprise ending to the carjacking that started in Hollywood. The jury could reasonably find Kelly helped lead the victim to a dangerous area with the knowledge and intent that harm would come to him.

B. *Alleged Instructional Error*

The court instructed the jury with a modified version of CALJIC No. 3.02 (2000 re-rev.).[4] The instruction informed the jury the target crimes were robbery and/or carjacking, and the attempted murder had to be a natural and probable consequence of either of the target crimes. Kelly argues the jury was not told it could convict him of attempted murder only if the crime was committed during or in furtherance of the commission of the target offenses. He concludes the evidence was undisputed the robbery and carjacking were complete at the time of the attempted murder, and the failure to properly instruct the jury warrants a reversal.

Respondent counters the jury was correctly instructed as to the duration of a robbery, and the evidence showed the robbery and carjacking were still in progress at the time Taglieri was pushed off the cliff, by virtue of the fact defendants kept their victim captive. The People cite language from *People v. Carter* (1993) 19 Cal.App.4th 1236 [23 Cal.Rptr.2d 888], which states, "In cases involving a kidnapping and robbery, courts have held almost without exception that the evidence supported the conclusion the robber had not reached a place of temporary safety so long as the victim remained under the robber's control." (*Id.* at p. 1251; see also *People v. Fields* (1983) 35 Cal.3d 329, 365–368 [197 Cal.Rptr. 803, 673 P.2d 680], wherein the court provides an analysis of cases.)

Kelly points to the one case that is the exception, *People v. Ford* (1966) 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132]. In *Ford*, defendant robbed an individual and continued to drive with him aimlessly for approximately four hours. Eventually, Ford was stopped by a deputy sheriff, whom Ford shot and killed. The court found the robbery had been completed for purposes of the felony-murder rule, noting the lapse of time between the robbery and the killing and the strong evidence Ford was not attempting to escape the robbery at the time of the killing. It concluded Ford had reached several places of temporary safety along the way, and concluded the killing was not perpetrated during the course of the robbery.

This case can be distinguished on several grounds. First, the murder victim in *Ford*, the deputy sheriff, was not the robbery victim, making it easier to conclude the killing was unconnected to the robbery. Second, during the trip with the victim, defendants continued to take property from his ATM. Third, defendants were in the process of doing harm directly to the robbery victim when the attempt was made on his life.

■ "Whether in a given case the robber has reached a place of safety is ordinarily a question of fact; a jury's implied finding on the issue will be

---

[4] The January 2005 version is substantially the same.

upheld so long as supported by substantial evidence. [Citations.]" (*People v. Carter, supra,* 19 Cal.App.4th at p. 1251.) Here, the jury could reasonably conclude the robbery was not complete and defendants' attempt to kill Taglieri was a means of eluding police detection or eliminating a witness. (*People v. Fields, supra,* 35 Cal.3d at p. 368.) There was no instructional error.

In another attack on the instructions, Kelly argues the trial court failed to inform the jury it had to find that a *premeditated* attempted murder had to be a natural and probable consequence of the robbery or carjacking. Citing *Blakely v. Washington* (2004) 542 U.S. 296 [159 L. Ed.2d 403, 124 S.Ct. 2531], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], Kelly claims the failure to instruct denied him his constitutional right to have the jury determine any fact used to enhance his sentence.

The question of whether a jury must find a *premeditated* attempted murder to be a natural and probable consequence of a target crime appears to be one of first impression. In *People v. Lee* (2003) 31 Cal.4th 613 [3 Cal.Rptr.3d 402, 74 P.3d 176], our Supreme Court determined that an individual could be convicted of premeditated attempted murder, even if he did not personally act with deliberation and premeditation. The law only required that the attempted murder had to be committed by one of the perpetrators with the requisite state of mind. Because the facts of that case did not involve the doctrine of natural and probable consequences, the court left that question open.

However, *Lee* did note, "we conclude that the Legislature reasonably could have determined that an attempted murderer who is guilty as an aider and abettor, but who did not personally act with willfulness, deliberation, and premeditation, is sufficiently blameworthy to be punished with life imprisonment. . . . Punishing such an attempted murderer with life imprisonment would not run counter to section 664(a)'s purpose of making the punishment proportionate to the crime. Of course, where the natural-and-probable-consequences doctrine does apply, an attempted murderer who is guilty as an aider and abettor may be less blameworthy. In light of such a possibility, it would not have been irrational for the Legislature to limit section 664(a) only to those attempted murderers who personally acted willfully and with deliberation and premeditation. But the Legislature has declined to do so." (*People v. Lee, supra,* 31 Cal.4th at pp. 624–625.)

We see no reason, under the facts of this case, to depart from the reasoning of the *Lee* court in a situation that applies the natural and probable consequences doctrine. As noted above, Kelly was a willing and active participant in all the steps that led to the attempt on Taglieri's life. Although the evidence did not conclusively determine which defendant had

physical contact with the victim when he was pushed, certainly Kelly's conduct makes him no less blameworthy than Cummins. The jury here was properly instructed on the elements of attempted premeditated murder and, based on the evidence, found the attempt on Taglieri's life was willful, deliberate, and premeditated. Nothing more was required.

## C. *Consecutive Sentences*

Kelly was sentenced to two consecutive life terms, one for the attempted murder conviction and one for the kidnapping for the purpose of carjacking conviction. He was also given a separate consecutive term for the robbery. He argues the court should have stayed one of the life sentences and the robbery term because he was found guilty of attempted murder under the "natural and probable consequences" doctrine. Thus, he had only the single intent to facilitate the robbery and the carjacking. Section 654 would bar his punishment for all three acts which were engaged in an indivisible course of conduct involving a single objective. He cites *People v. Bradley* (2003) 111 Cal.App.4th 765 [4 Cal.Rptr.3d 166] to support his position.

In *Bradley,* appellant was a young woman who agreed to lure a prosperous-looking customer into leaving a casino so her two male accomplices could rob him. She was to get the customer to drive her in his car and then entice him to stop somewhere along the way. Her accomplices would come upon the scene, rob the victim, and put him into the trunk of the car.

The plan worked to the point where appellant's accomplices stormed the vehicle where she had parked it. The accomplices took control of the car and drove away, with appellant following in another vehicle being driven by another friend. All was going well until the accomplices attempted to put the victim into the trunk of the car. When they were unsuccessful in accomplishing this act, one of the men shot the victim eight times.

Appellant was convicted of attempted murder and robbery and the trial court sentenced her to consecutive terms. She appealed claiming the sentence was barred by section 654. She raised the identical argument presented by Kelly in his appeal.

The *Bradley* court held the trial court could not impose consecutive sentences since the facts of the case clearly showed "[a]ppellant had only one objective and one intent—to aid and abet a robbery of the victim[.]" (*People v. Bradley, supra,* 111 Cal.App.4th at p. 768.) *Bradley* went on to note appellant "was unaware that [the attempted murder] was occurring until after it was completed and thus didn't have an opportunity to prevent or even protest its commission. As a result, there simply was no evidence appellant

exhibited the more dangerous mental state warranting a consecutive sentence under . . . section 654." (*Id.* at p. 771.)

The *Bradley* court did acknowledge another appellate court affirmed consecutive sentences in a factually similar situation. In *People v. Nguyen, supra,* 204 Cal.App.3d 181, Nguyen agreed to commit a robbery. While he was attempting to take money out of the cash register, his confederate took the victim into a back room, robbed him of his money, and shot him. The jury convicted Nguyen of attempted murder under the "natural and probable consequences" doctrine. The trial court imposed consecutive sentences for the attempted murder and the robbery. The sentence was affirmed.

The *Bradley* court distinguished its case by noting that Nguyen played a much larger role in the shooting which took place during his robbery than Bradley did in hers. Nguyen entered the market with the clear intent to commit a robbery with an accomplice who was carrying a loaded gun and later encouraged him to shoot the victim by shouting a word, which apparently was a Vietnamese battle cry used in conjunction with a shooting or killing.

"As a result, applying the rationale of our opinion to Nguyen, he would still be subject to consecutive sentencing. Ample evidence in the record of that case would support a finding Nguyen shared his cohort's independent objective of attacking the victim. Indeed he evidently was the instigator of that attack. This contrasts sharply with appellant's role—or actually non-role—in her cohort's shooting of the victim here. Not only did she not encourage the attack, she was oblivious this deviation from the original plan was taking place until the shots rang out and the attempted murder was completed." (*People v. Bradley, supra,* 111 Cal.App.4th at p. 772.)

Kelly's participation in the attempted murder in our case mirrors Nguyen's very closely. He drove the vehicle to the site of the attempt. He helped lead the victim to the precise location where the attempt was made. He ordered the victim to keep walking and told him he would be shot if he turned around. He was present when the victim was pushed off the cliff. It is clear Kelly shared the objectives of Cummins, that is to rob the victim and to keep him from pointing out his attackers. As noted in dealing with Cummins's similar sentencing issue, the trial court's determination the crimes in question had separate objectives was supported by the evidence. Consecutive sentences were properly imposed.

Kelly's constitutional claim that double jeopardy bars consecutive sentencing in this instance is unsupported by any legal authority. Kelly cites case law which notes a defendant may not be subjected to multiple punishments

for committing the same offense. This is inapplicable to our situation where he was convicted of multiple crimes with different statutory elements. (*People v. Herbert* (1936) 6 Cal.2d 541, 544–548 [58 P.2d 909].)

D.–G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

V

DISPOSITION

Defendants' convictions for carjacking and burglary are reversed. Kelly's enhancement pursuant to section 12022.7 is stricken. The matter is remanded for the trial court to correct the abstracts of judgment accordingly and forward the new abstracts to the Department of Corrections. In all other respects, the judgments are affirmed.

Spencer, P. J., and Mallano, J., concurred.

Appellants' petitions for review by the Supreme Court were denied June 29, 2005. Brown, J., did not participate therein.

---

*See footnote, *ante*, page 667.