Filed 9/25/20  P. v. Dudley CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B300919 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA439602) |
| v. | |
| JAMES DUDLEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed in part; reversed in part; and remanded with instructions.

Mark R. Feeser, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

James Dudley appeals from a judgment entered after a jury convicted him of attempted murder, kidnapping for robbery (aggravated kidnapping), two counts of false imprisonment, and two counts of second degree robbery in connection with a 2015 robbery of a marijuana dispensary. As to the false imprisonment counts, the jury found true a principal was armed with a firearm.

On appeal, Dudley contends there is insufficient evidence of aggravated kidnapping because his movement of the victim was incidental to the intended robbery. Dudley also argues his attempted murder conviction must be reversed because it was premised on the natural and probable consequences theory of aider and abettor liability, which pursuant to Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) is no longer a viable theory of liability. Alternatively, Dudley asserts the sentence on count 6 for robbery should be stayed under Penal Code section 654[1] because he had a single objective—to commit the robbery—and there was no evidence he intended to commit the murder. We reverse Dudley's conviction of aggravated kidnapping and order the trial court on remand to stay the sentence on count 6 for robbery under section 654. We otherwise affirm and remand for resentencing.[2]

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    Because we reverse Dudley's conviction of aggravated kidnapping, we do not address his argument his conviction on count 5 for false imprisonment must be vacated because it is a lesser included offense of aggravated kidnapping.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Evidence at Trial*
    1.    *The robbery*

Anjik Butler and Heidi Van Gundy worked at a medical marijuana dispensary in Los Angeles. The dispensary had a front, middle, and back room, with a small hallway that led to a bathroom in the back. The dispensary had one security camera outside and three inside, one in each room. Display cases holding marijuana products and a cash box were located in the middle room. Additional cash and marijuana products were kept in a safe in the back room.

The only way to enter or exit the dispensary was through the front door. The glass door had no handle on either side; instead, the door could only be opened by using a key to unlock the door. The door was kept locked during business hours. A key was kept in the keyhole on the inside of the door to let people in or out. When a customer rang the doorbell, an employee would unlock the door to let the customer in, then relock the door. The dispensary had a single window facing the front of the dispensary. But both the door and the window were frosted. If someone inside the dispensary looked through the frosted door, he or she could only see the silhouette of the person outside. However, a monitor in the middle room showed who was at the front door.

On the evening of May 24, 2019, as Van Gundy and Butler were preparing to close the dispensary, they heard the doorbell ring. Butler was sitting at the desk in the front room. Van Gundy unlocked the door, and Edward Cloud, Jr., and a second man walked in. Neither of the men was wearing a face covering.

Before Van Gundy could lock the door again, Dudley entered the dispensary and pushed Van Gundy up against the wall. He was wearing a beanie and a bandana that covered half his face. Cloud then pulled out a gun and told Van Gundy and Butler to go to the back room where the safe was located. Butler told the men she was three months pregnant and did not want to cause any problems.

Cloud and Dudley moved Van Gundy and Butler from the front room, through the middle room, to the back room. One of the men ordered Van Gundy to open the safe, which she did. Dudley took money and marijuana products from the safe and placed them into a backpack. While he did this, Cloud pointed his gun at Van Gundy and Butler and ordered them to sit on the floor and not move, or they would be hurt. One of the men ripped the telephone off the wall and removed the digital video recorder and monitor that were on top of the safe.

Dudley and Cloud then directed Van Gundy and Butler to go to the middle room to help remove the marijuana and marijuana products in the display cases. The second man had already started "bagging up" the marijuana and other items. Van Gundy and Butler helped the men put everything from the display cases into bags. One of the men asked Butler and Van Gundy where the rest of the money was, and they pointed to the cash box in the middle room. The second man took the cash from the cash box. Van Gundy was "crying and kind of freaking out."

As Van Gundy and Butler were helping to remove the marijuana products, the doorbell rang. The three men panicked. Butler could tell from viewing the monitor in the middle room that the person at the door was a regular customer. She suggested to the men she tell the customer they had run out of

marijuana, so he would leave without becoming suspicious. After the three men discussed the matter, Cloud told Butler, "Oh, go. But if you do anything, like, we have [Van Gundy]. And, you know, don't do anything stupid." Cloud then took Van Gundy's bag, which contained her cell phone and tablet computer. Butler opened the door and told the customer they did not have any products, but he could come back another day.

While Butler was at the front door talking to the customer, Dudley started aggressively pushing Van Gundy down the hallway, "manhandling" her. Van Gundy was afraid if she went down the hall to the bathroom, she might never come back. The bathroom had no window, and there was no way out other than through the hallway to the middle room. By this point Dudley had pushed Van Gundy about halfway down the hallway, which was approximately 13 feet long. Van Gundy started to fight back and pushed Dudley away. As they were fighting, Van Gundy pulled Dudley's bandana down and took his beanie off his head. She saw a cigarette butt fall from under his beanie. Van Gundy headed back to the middle room and was able to reach the corner of the middle room, when Cloud came up and hit her in the head with the gun and "knocked [her] out."

After the customer left, the three men tried to run out the front door, but they were struggling to open the door with the key. Van Gundy regained consciousness and saw the three men heading to the front of the dispensary. One of the men grabbed her purse. Van Gundy stood up and yelled for Butler to call the police. Cloud then turned around and started shooting. Butler jumped over the counter to avoid getting shot. Van Gundy heard the gunshots and threw herself onto the floor. One bullet hit Butler in the back of her right leg. Another bullet shattered the

glass of a display case behind Van Gundy. The three men fled, taking everything from the safe, most of the marijuana, and all the money.

Immediately after the three men left, Van Gundy ran outside and asked a man in a neighboring business to call the police. Butler was taken by ambulance to the hospital.

### 2. *The police investigation*

Los Angeles Police Officer Peter Kouvelis and his partner responded to the call and arrived at the scene. They recovered from inside the dispensary two bullets, two spent shell casings, a beanie, and a cigarette butt. The officers also recovered from the surrounding area multiple items, including a bandana, a shirt, a sweater, a "hoodie," and a backpack. The next day a woman saw a gun in the bushes in front of a house near the dispensary, and she called the police. A criminalist in the Los Angeles Police Department Firearm Analysis Unit identified the gun at trial as a semiautomatic pistol, and he opined the bullets and shell casings recovered from the dispensary were fired from the gun. Fingerprint impressions taken from inside the safe at the dispensary matched those of Dudley. In addition, DNA profiles from the cigarette butt and the bandana matched the DNA obtained from Dudley.

### 3. *The gang evidence*

In March 2015 Dudley admitted to Los Angeles Police Officer Dave Vinton that he was a member of the Marvin Gangster Crips (MGC) street gang. Cloud admitted to a different police officer he was a member of the MGC street gang.

Los Angeles Police Officer Mario Aride testified as a gang expert at trial. Officer Aride opined Dudley and Cloud were active members of the MGC gang. In response to a hypothetical mirroring the facts of the case, Officer Aride opined the robberies and shooting were committed for the benefit of and in association with a criminal street gang. The crimes were committed in association with the gang because two of the three robbers were members of the MGC gang. In addition, the crimes would benefit the gang because the two gang members would return to their territory and brag about the crimes, creating fear and intimidation within the area. They would also gain fame and respect for the gang from reselling the marijuana in their area.[3]

B.  *Verdicts and Sentencing*

The jury found Dudley guilty of the attempted murder of Butler (§§ 187, subd. (a), 664; count 1); aggravated kidnapping of Van Gundy (§ 209, subd. (b)(1); count 3); two counts of false imprisonment by violence (§ 236; count 4 [Butler] & 5 [Van Gundy]); and two counts of second degree robbery (§ 211; count 6 [Butler] & 7 [Van Gundy]).[4] The jury also found true a principal was armed with a firearm as to counts 4 and 5 (§ 12022, subd. (a)(1)). The jury was unable to reach a verdict as to the alleged firearm and gang enhancements, and the trial court declared a

---

[3]     Dudley did not testify or call any witnesses.

[4]     The information charged Dudley and Cloud with the same offenses, but Dudley was tried separately. Prior to trial, the trial court granted Dudley's motion to dismiss count 2 for the aggravated kidnapping of Butler pursuant to section 995. During trial, the court granted Dudley's motion for acquittal under section 1118 on count 8 for dissuading a witness.

7

mistrial on those allegations. Pursuant to a negotiated plea agreement, Dudley admitted the allegation he committed the second degree robbery of Butler (count 6) for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)), and as to that count a principal personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)). Under the agreement, the sentences on both enhancements would be stayed.

The trial court sentenced Dudley to an indeterminate term of life in prison on count 3 for the aggravated kidnapping of Van Gundy. The court also sentenced Dudley to a consecutive aggregate determinate term of 10 years eight months. On count 1 for the attempted murder of Butler, the trial court imposed the upper term of nine years. On count 4 for the false imprisonment of Butler, the court imposed a consecutive term of eight months (one-third the middle term of two years) and stayed a consecutive term of four months on the firearm enhancement. On count 5 for the false imprisonment of Van Gundy, the court imposed and stayed a three-year sentence comprised of the middle term of two years plus one year for the firearm enhancement. On count 6 for the second degree robbery of Butler, the court imposed a one-year consecutive term (one-third the middle term of three years) and imposed and stayed a sentence of 25 years to life on the firearm enhancement pursuant to the plea agreement.[5] On count 7 for

---

[5] There was a discussion on the record of the court's power to dismiss (instead of staying) the punishment for the firearm enhancement on count 6, but the minute order and abstract of judgment reflect that the enhancement was stayed, not dismissed.

the second degree robbery of Van Gundy, the court imposed and stayed the middle term of three years.

Dudley timely appealed.

## DISCUSSION

A.     *There Was Insufficient Evidence To Support Dudley's Conviction of Aggravated Kidnapping*

1.     *Standard of review*

In evaluating the sufficiency of the evidence to support a conviction, "'we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict— i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.'" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142; accord, *People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

2.     *Requirement of asportation for aggravated kidnapping*

A person who kidnaps or carries away another person to commit robbery is guilty of aggravated kidnapping. (§ 209, subd. (b).) "Kidnapping for robbery requires asportation, i.e., movement of the victim that is not merely incidental to the commission of the robbery and that increases the risk of harm

over that necessarily present in the crime of robbery itself." (*People v. Delgado* (2013) 56 Cal.4th 480, 487; see § 209, subd. (b)(2) [aggravated kidnapping occurs only "if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense"]; *People v. Vines* (2011) 51 Cal.4th 830, 870 (*Vines*), overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

"The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 (*Dominguez*).) The Supreme Court in *People v. Rayford* (1994) 9 Cal.4th 1, 12 described the test for asportation necessary for aggravated kidnapping as a two-prong test, as first set forth in *People v. Daniels* (1969) 71 Cal.2d 1119, 1131, footnote 5 (*Daniels*). The *Rayford* court held, "As for the first prong, or whether the movement is merely incidental to the crime of robbery, the jury considers the 'scope and nature' of the movement." (*Rayford*, at p. 12.) The second prong is "whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in robbery."[6] (*Rayford*, at p. 13.)

To prove kidnapping for robbery, both parts of the two-prong test for asportation must be met. (*Vines, supra*, 51 Cal.4th at p. 869; *People v. Taylor* (2020) 43 Cal.App.5th 1102, 1108.) "These two elements are not mutually exclusive but are interrelated." (*Vines*, at p. 870; accord, *Dominguez, supra*,

---

[6]  In 1997, the Legislature amended section 209, subdivision (b), to "eliminat[e] the requirement that the movement of the victim 'substantially' increase the risk of harm to the victim." (*Vines, supra*, 51 Cal.4th at p. 869, fn. 20.)

39 Cal.4th at p. 1152.) "[E]ach case must be considered in the context of the totality of its circumstances." (*Dominguez*, at p. 1152.)

In analyzing the scope and nature of the movement for purposes of the first prong, the jury must consider the distance the victim is moved, "as well as '*the context of the environment in which the movement occurred.*'" (*Dominguez, supra*, 39 Cal.4th at p. 1151; accord, *Vines, supra*, 51 Cal.4th at p. 870.) "There is, however, no minimum distance a defendant must move a victim to satisfy the first prong." (*Vines*, at p. 870.) But the courts have typically found more significant distances than the six-and-a-half feet at issue in this case to be insufficient to show asportation. (See, e.g., *Daniels, supra*, 71 Cal.2d at pp. 1123-1125 [movement of victims six to 30 feet around an apartment to rob and rape them not sufficient for aggravated kidnapping]; *People v. Williams* (2017) 7 Cal.App.5th 644, 668 (*Williams*) [movement of employees 40 to 60 feet to back of store to commit robberies merely incidental]; *People v. Washington* (2005) 127 Cal.App.4th 290, 300-301 (*Washington*) [movement of employees 35 to 45 feet from teller area to vault during bank robbery merely incidental]; *People v. Hoard* (2002) 103 Cal.App.4th 599, 607 (*Hoard*) [movement of two employees 50 feet to back of jewelry store during robbery merely incidental].)

Further, "'[i]ncidental' means 'that the asportation play no significant or substantial part in the planned [offense], or that it be a more or less "trivial change[] of location having no bearing on the evil at hand.'"'" (*People v. James* (2007) 148 Cal.App.4th 446, 454 (*James*).) Courts have recognized "[i]t is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved into and left

11

in another room or place." (*Daniels, supra*, 71 Cal.2d at p. 1134, italics omitted; accord, *Williams, supra*, 7 Cal.App.5th at p. 667 ["'[T]he *Daniels* court recognized '"the absurdity of prosecuting for kidnapping in cases where the victim is forced . . . to the back of his store in the course of a robbery."'"]; *Hoard, supra*, 103 Cal.App.4th at p. 603 ["Generally, brief movement inside the premises where a robbery is being committed is considered incidental to the crime and does not substantially increase the risk of harm otherwise present."].)

As to the second prong—whether the movement increased the risk of harm to the victim above that present in the underlying crime—the jury should consider ""'such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased."'" (*Vines, supra*, 51 Cal.4th at p. 870; accord, *People v. Simmons* (2015) 233 Cal.App.4th 1458, 1471.)

> 3. *There was insufficient evidence Dudley's movement of Van Gundy was not merely incidental to the robbery, and the movement only minimally increased the risk of harm to Van Gundy*

Dudley contends his movement of Van Gundy halfway down the hallway was only a short distance intended to accomplish the robbery by preventing Van Gundy from alerting the customer at the door to the robbery, and thus it was "merely incidental" to the crime. (*Rayford, supra*, 9 Cal.4th at p. 13.) Further, Dudley argues his movement of Van Gundy at most

12

minimally increased the risk of harm to her because she was moved from the middle room with no windows or door a short distance back to the hallway, which also had no windows or a door. Dudley's contentions have merit.

Here, when the customer appeared at the front door, Van Gundy and Butler were still helping the three men place the marijuana products into bags. The robbers agreed to allow Butler to respond to the customer to prevent the customer from learning a robbery was in progress and thwarting completion of the robbery. Butler testified at trial she "cracked [the door] a little bit so [the customer] wasn't able to see, like, inside . . . ." According to Butler, the robbers all went to the back so the customer could not see them. In this context, moving Van Gundy down the hallway to keep her hidden from the customer and to prevent Van Gundy from drawing attention to the robbery facilitated the ongoing crime.

The People contend the movement of Van Gundy was not merely incidental to the robbery because the robbery had been largely accomplished by the time Dudley moved Van Gundy down the hallway, relying on the observation in *James, supra*, 148 Cal.App.4th at page 454 that "the fact that the movement of a robbery victim *facilitates* a robbery does not imply that the movement was merely incidental to it." The facts in *James* are distinguishable. There, the Court of Appeal concluded there was sufficient evidence of asportation where the robbers forced a maintenance worker at gunpoint into a bingo club to gain access to the club, then forced him onto the floor while the robbery of the club continued. (*Id*. at pp. 456-457.) The court reasoned the movement of the worker at gunpoint even after his purpose had been fulfilled (to gain entry) was not merely incidental to the

13

robbery and substantially increased the risk to him by bringing him into the enclosed bingo club while the robbery was committed. (*Id*. at pp. 457-458.) The *James* court explained, "[T]he robbery of a business employee *does not* include the risk that *other* individuals will be moved, at gunpoint, from the relative safety of the outdoors, into the business premises for the duration of the robbery." (*Id*. at p. 457.)

Here, the movement of Van Gundy not only facilitated the robbery, but was a significant part of the continuing robbery, which included removal of the marijuana products both before and after the kidnapping. The facts are more similar to those in *Williams, supra*, 7 Cal.App.5th at page 669, *Washington, supra*, 127 Cal.App.4th at page 299, and *Hoard, supra*, 103 Cal.App.4th at page 607, in which the courts found the movement of the employees to the backs of the stores (*Williams* and *Hoard*) and vault area (*Washington*) during the robberies were merely incidental, because the movement facilitated the crimes "with no other apparent purpose" (*Hoard*, at p. 607), there was "no excess or gratuitous movement of the victims over and above that necessary to obtain the money in the vault" (*Washington*, at p. 299), and "the robbers had good reason to move the victims to the back of the store to achieve their objective" (*Williams*, at p. 670). (Cf. *People v. Corcoran* (2006) 143 Cal.App.4th 272, 279-280 [evidence supported aggravated kidnapping where movement of victims into small back office with no windows and a solid door was "'excess and gratuitous'" because robbery had been aborted].)

The People also contend Dudley's movement of Van Gundy down the hallway increased the risk of harm to her above that involved in the robbery given the lack of any window or exit from the hallway, likening the facts here to those in *Vines, supra*,

14

51 Cal.4th at pages 870 to 871, in which the Supreme Court concluded the defendant's movement of four McDonald's employees from the front of the store, down a hidden stairway, and into a locked freezer supported the defendant's conviction of aggravated kidnapping. The Supreme Court explained, "[T]he movement subjected the victims to a substantially increased risk of harm because of the low temperature in the freezer, the decreased likelihood of detection, and the danger inherent in the victims' foreseeable attempts to escape such an environment." (*Id.* at p. 871.)

The People's reliance on *Vines* is misplaced. Although Dudley moved Van Gundy from the middle room to the hallway to prevent her from alerting the customer to the robbery, in contrast to the placement of the employees in a cold freezer in *Vines*, here the middle room itself had no windows or door. Instead, it opened onto the front room, which had a frosted window and a single exit through a frosted locked door. The risks to Van Gundy from being moved down the hallway were those inherent in the robbery itself—that the robbers would use force to keep her from alerting the customer to the robbery in progress. Although she was afraid of being moved down the hallway toward the bathroom, even before the movement she was "crying and kind of freaking out."

B. *Senate Bill 1437 Does Not Require Reversal of Dudley's Conviction of Attempted Murder*

On September 30, 2018 Senate Bill 1437 was signed into law, effective January 1, 2019. Senate Bill 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that

15

murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Sen. Bill 1437 (2017-2018 Reg. Sess.) § 1; see *People v. Verdugo* (2020) 44 Cal.App.5th 320, 325, review granted Mar. 18. 2020, S260493; *People v. Martinez* (2019) 31 Cal.App.5th 719, 723 (*Martinez*).)

New section 188, subdivision (a)(3), provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Senate Bill 1437 also added section 189, subdivision (e), which provides, "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

Dudley contends Senate Bill 1437, although explicitly applying to convictions of murder, also applies to attempted murder. We rejected a similar argument in *People v. Lopez* (2019) 38 Cal.App.5th 1087 (*Lopez*), review granted Nov. 13,

16

2019, S258175.[7] (*Lopez*, at pp. 1103-1107 ["Senate Bill 1437 does not modify accomplice liability for attempted murder" (italics & capitalization omitted)]; accord, *People v. Munoz* (2019) 39 Cal.App.5th 738, 753, review granted Nov. 26, 2019, S258234 [citing *Lopez* and concluding "Senate Bill 1437 does not apply to the offense of attempted murder"].) In *Lopez*, we held "there is nothing ambiguous in the language of Senate Bill 1437, which, in addition to the omission of any reference to attempted murder, expressly identifies its purpose as the need 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder . . . .'" (*Lopez*, at p. 1104.) The legislation's "obvious intent to exclude attempted murder from the ambit of the Senate Bill 1437 reform" was further corroborated by the language of new section 1170.95[8] and its legislative history. (*Lopez*, at pp. 1104-1105.)

_____

[7] The Supreme Court granted review in *Lopez* on the following issues: "(1) Does Senate Bill No. 1437 (Stats. 2018, ch. 1015) apply to attempted murder liability under the natural and probable consequences doctrine? (2) In order to convict an aider and abettor of attempted willful, deliberate and premeditated murder under the natural and probable consequences doctrine, must a premeditated attempt to murder have been a natural and probable consequence of the target offense?" (Supreme Ct. Minutes, Nov. 13, 2019, p. 1623; *Lopez, supra*, 38 Cal.App.5th 1087, review granted Nov. 13, 2019, S258175.)

[8] Section 1170.95, subdivision (a), "authorizes only those individuals 'convicted of felony murder or murder under a natural and probable consequences theory' to petition for relief; and the petition must be directed to 'the petitioner's murder conviction.' Similarly, section 1170.95, subdivision (d)(1), authorizes the court to hold a hearing to determine whether to

17

Moreover, new section 1170.95 provides a procedure for people convicted of murder to petition the trial court for retroactive relief if the changes in the law affect their previously sustained convictions. (Sen. Bill 1437 (2017-2018 Reg. Sess.) § 4.) In enacting this procedure, "the Legislature intended convicted persons to proceed via section 1170.95's resentencing process rather than avail themselves of Senate Bill 1437's ameliorative benefits on direct appeal." (*Martinez, supra*, 31 Cal.App.5th at p. 728; accord, *People v. Cervantes* (2020) 46 Cal.App.5th 213, 221; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1153.) Therefore, even if Dudley were eligible for relief, he could only obtain relief pursuant to the procedure set forth under section 1170.95, not on direct appeal.

C.    *The Trial Court Erred by Not Staying the Sentence for Robbery of Butler Under Section 654*

1.    *Applicable law*

Section 654, subdivision (a), provides in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." ""Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more

_____

vacate 'the murder conviction.'" (*Lopez, supra*, 38 Cal.App.5th at p. 1105.)

18

than one.""" (*People v. Capistrano* (2014) 59 Cal.4th 830, 885, overruled on another ground by *Hardy, supra*, 5 Cal.5th at p. 104; accord, *People v. Jackson* (2016) 1 Cal.5th 269, 354.)

"Intent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense." (*People v. Jackson, supra*, 1 Cal.5th at p. 354; accord, *People v. Capistrano, supra*, 59 Cal.4th at p. 886.) But where, as it is here, "those facts are undisputed . . . the application of section 654 raises a question of law we review de novo." (*People v. Corpening* (2016) 2 Cal.5th 307, 312.)

> 2. *Dudley had a single criminal objective—to commit a robbery*

In sentencing Dudley to a consecutive term on count 6 for the robbery of Butler, the trial court found Dudley had separate criminal intents for the robbery and the attempted murder, noting "[t]he robberies were exceptionally violent" and the "[v]iolence went far beyond that which was necessary to accomplish the goal of stealing from the dispensary." Dudley argues he had a single criminal objective—commission of the robbery—not the commission of the attempted murder, for which Dudley was convicted on an aiding abetting theory that Cloud's attempt to kill Butler was a natural and probable consequence of the robbery. Dudley's contention has merit.

The holding in *People v. Bradley* (2003) 111 Cal.App.4th 765 (*Bradley*), relied on by Dudley, is directly on point. There, the female defendant was part of a plan for her to "entice some prosperous-looking customer into leaving a casino so her two male accomplices could rob him." (*Id.* at p. 767.) Although the

19

defendant successfully lured the customer out of the casino and the male accomplices were able to enter the customer's car and steal his jewelry and money, the plan went awry when the robbers learned the customer did not own the car he was driving. (*Id.* at pp. 767-768.) In response, one of the robbers beat the customer with a firearm and shot him in the upper torso. (*Id.* at p. 768.) As here, the defendant was convicted of robbery, as well as attempted murder as an aider and abettor of the robbery based on the natural and probable consequences doctrine. (*Ibid.*) The Court of Appeal reversed the trial court's imposition of consecutive sentences for robbery and attempted murder, holding the defendant "had a single criminal objective—the robbery of [the customer]." (*Id.* at p. 771.) As the *Bradley* court explained, the defendant "was unaware that second crime was occurring until after it was completed and thus didn't have an opportunity to prevent or even protest its commission. As a result, there simply was no evidence [she] exhibited the more dangerous mental state warranting a consecutive sentence under . . . section 654." (*Ibid.*)

The *Bradley* court distinguished *People v. Nguyen* (1988) 204 Cal.App.3d 181 (*Nguyen*), relied on by the People. In *Nguyen*, the Court of Appeal concluded section 654 did not bar imposition of consecutive sentences for robbery and attempted murder where the attempted murder conviction was based on the natural and probable consequences doctrine. (*Nguyen*, at pp. 187, 193.) As the *Bradley* court explained, however, "[T]he *Nguyen* court did not confront nor expressly discuss whether that aider and abettor could legitimately be found to have entertained multiple objectives and thus legitimately receive consecutive sentences for those two offences." (*Bradley, supra*,

111 Cal.App.4th at p. 771.) *Bradley* also distinguished *Nguyen* on the basis there was evidence the defendant there "actively encouraged the shooter to kill the victim." (*Ibid.*) As the *Nguyen* court described the shooting, "The victim heard Nguyen shout a Vietnamese battle phrase used when 'someone was to kill or be killed.' Nguyen's crime partner then kicked the clerk in the ribs and shot him in the back, fortunately not fatally." (*Nguyen*, at p. 185.)

The People's reliance on *People v. Cummins* (2005) 127 Cal.App.4th 667, 681-682, is likewise misplaced. In *Cummins*, the Court of Appeal upheld the imposition of consecutive sentences imposed on the defendant for robbery, kidnapping for the purpose of carjacking, and attempted murder under the natural and probable consequences doctrine. However, unlike here, the defendant actively participated in the attempted murder, driving the victim with the perpetrator to the location of the attempted murder, ordering the victim to walk to the edge of the cliff, directing the victim not to turn around or he would be shot, and then standing on the edge of the cliff while the perpetrator pushed the victim over the edge. (*Id*. at p. 678.) As the *Cummins* court observed, "The jury could reasonably find [the defendant] helped lead the victim to a dangerous area with the knowledge and intent that harm would come to him." (*Ibid.*) The court concluded the defendant had separate objectives in robbing and attempting to kill the victim, explaining "[the defendant] shared the objectives of [the perpetrator], that is to rob the victim and to keep him from pointing out his attackers." (*Id*. at p. 682.)

Here, Cloud started to shoot after Van Gundy yelled for Butler to call the police. Although it was reasonable for the jury to have concluded Cloud's shooting was a natural and probable

21

consequence of an employee calling for help during an armed robbery, unlike *Nguyen* and *Cummins*, there was no evidence Dudley encouraged or instigated the shooting. The People point to Dudley's violence in pushing Van Gundy against a wall when he entered the dispensary, then violently moving her down the hallway when the customer was at the front door. But Dudley's violent treatment of Van Gundy during the robbery does not show his intent that Cloud start shooting and attempt to kill Butler as they were leaving the dispensary. Rather, the evidence supports a finding, as in *Bradley*, the shooting was a "deviation from the original plan." (*Bradley, supra,* 111 Cal.App.4th at p. 772.) Because there was no evidence Dudley had a separate criminal objective to kill Butler, the trial court should have stayed the sentence on count 6 for the second degree robbery of Butler pursuant to section 654.

## DISPOSITION

Dudley's conviction on count 3 for aggravated kidnapping is reversed. In all other respects the convictions are affirmed. The matter is remanded for the trial court to stay the sentence on count 6 for the second degree robbery of Butler under section 654 and to resentence Dudley.


FEUER, J.

We concur:


PERLUSS, P. J.          SEGAL, J.

22